**BANKATLANTIC, f/k/a Atlantic Federal Savings and Loan Association of Fort Lauderdale, Plaintiff,**

**v.**

**BLYTH EASTMAN PAINE WEBBER, INC., n/k/a PaineWebber, Inc., Defendant.**

**No. 87–6643–CIV.**

United States District Court, S.D. Florida.

July 10, 1989.

---

Eugene Stearns, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, Fla., for plaintiff.

Arthur England, Schwartz, Nash, Block & England, Fine Jacobson, Miami, Fla., for defendant.

## MEMORANDUM ORDER

SCOTT, District Judge.

The complaint in this action raises serious issues about the duties of a financial advisor to a federal savings and loan association. Even for a commercial dispute, the stakes are high—twenty-nine million dollars.[1] Plaintiff, BankAtlantic, claims that Defendant, PaineWebber, Inc.,[2] has attempted to reduce the risk of loss on the merits by concealing damaging evidence in defiance of a prior Order. Plaintiff has moved to strike Defendant's pleadings and enter a default. Defendant denies any wrongdoing.

The Court is therefore faced with a delicate task. Our mission is to preserve the integrity of the discovery process while protecting Defendant's right to a full and fair trial on the merits. These important values sometimes conflict. When presented with such a case, the Court must balance the competing interests to reach a fair result.

The Court fully appreciates the personal, professional and financial interests affected by this motion. For that reason, we have been careful to afford both sides great latitude in their presentation of the issues, and we have given serious consideration to the product of their efforts. The parties have fully briefed the issues raised. The Court conducted a preliminary and full evidentiary hearing, where the parties questioned witnesses and introduced evidence over a period of three days. The transcript itself is over six hundred pages.

In addition, the Court has reviewed in detail all documents produced by Defendant in response to the Order to Show Cause issued after the preliminary hearing. Moreover, we have respected Defendant's assertion of various privileges pending in camera review. We have taken judicial notice of the entire record for the purpose of this motion. In sum, the parties have been given every possible opportunity to enlighten the Court on the facts and applicable law. After serious deliberation, we now render our decision.

## I. BACKGROUND

The Court will briefly review the history of this case to provide a sense of perspective. Thus, before assessing Plaintiff's motion, we first discuss the underlying dispute and the ensuing discovery battle.

### A. *Factual Allegations*

This litigation arises out of the triangular relationship between Plaintiff BankAtlantic, Defendant PaineWebber, Inc., and Homestead Savings ("Homestead"). Plaintiff is a federal savings and loan association. Plaintiff alleges that it retained Defendant as a financial advisor pursuant to an Engagement Letter executed on March 20, 1984. According to Plaintiff, Defendant suggested that Plaintiff agree to make certain investments known as interest rate swaps with Homestead to pro-

---

**1.** Plaintiff also seeks punitive damages.

**2.** Blyth Eastman Paine Webber, Inc., n/k/a PaineWebber, Inc.

vide a beneficial hedge against interest rate risk.

Simply put, Plaintiff would swap some of its variable-rate interest obligations for Homestead's fixed-rate interest obligations. While the parties would not actually transfer their principal obligations, they would agree to compensate each other as interest rates fluctuated. Thus, if interest rates rose above the fixed rate, Homestead would pay Plaintiff the difference between the amount due on the variable rate obligations and the amount due on the fixed rate obligations. Similarly, if interest rates fell, Plaintiff would pay Homestead the difference.

Plaintiff claims that in reliance on Defendant's advice, it agreed to two interest rate swaps with Homestead on March 23 and August 3, 1984, in the principal amounts of thirty-five and fifty million dollars, respectively. According to Plaintiff, the match was arranged by Defendant's agent, Butch Tharp, and Defendant received a $225,000 fee.

The investment soon proved disastrous for Plaintiff. As interest rates fell, Plaintiff was forced to pay millions of dollars to Homestead. Plaintiff now estimates its losses at twenty-nine million dollars to date.

Plaintiff seeks to hold Defendant liable for these continuing losses based on various theories of fraud and breach of fiduciary duty. Plaintiff's entire case is grounded in one basic charge, however—conflict of interest. According to Plaintiff, Defendant had a longstanding but undisclosed relationship with Homestead which directly conflicted with Defendant's role as Plaintiff's financial advisor. Plaintiff claims that this conflict precluded Defendant from warning Plaintiff about the immense risks of interest rate swaps. Plaintiff contends that Homestead was an improper swap partner, and that Defendant breached its duties by recommending the arrangement.

Defendant maintains that Plaintiff fully understood the risks of the investment. Moreover, by way of defense, Defendant argues that Plaintiff failed to mitigate its damages by selling the swaps or entering into reverse swaps. As to this defense, Plaintiff claims that no other financial institution was willing to assume Plaintiff's obligations, because Homestead was uncreditworthy. Defendant disputes this contention, and suggests that Plaintiff is speculating on the investment with future profits in mind.

### B. *The Discovery Dispute*

Plaintiff filed this action against Defendant on August 25, 1987. With the complaint, Plaintiff served Defendant with its first request for production. Two paragraphs of that request are at issue here:

8. All correspondence between you and Homestead Savings.

9. All documents relating to your association with Homestead Savings, including, but not limited to any contracts or engagement letters and any written or typed drafts of those contracts or engagement letters between you and Homestead Savings, and any correspondence, internal correspondence, notes or memoranda relating to your association with Homestead Savings.

Plaintiff defined "you" and "your" to include all affiliates of Defendant. Defendant filed various objections to paragraphs eight and nine, including a claim that the request was overbroad in requiring Defendant to ensure production from its affiliates.

Plaintiff filed a motion to compel production soon thereafter. At the hearing, Defendant promised to produce all documents in its "custody, control or possession." Based on that representation, the Court denied the motion to compel from Defendant's affiliates, but granted the motion in all other respects. The parties also agreed that for purposes of production, Blyth Eastman Paine Webber, Inc., and the successor corporation, PaineWebber, Inc., would be treated as parties to the action. *See* Letter of October 4, 1988 at 3.

The parties proceeded with discovery and prepared for trial, which had been specially set for June 19, 1989, after two prior trial

dates were continued. While the parties had the normal discovery battles of commercial litigation, the pretrial phase was rather uneventful overall.

This relative quietude was not to last, however. On the eve of trial, Plaintiff learned through independent investigation that Defendant and its affiliates had been involved in bitter litigation with Homestead in three separate lawsuits in the Northern District of California. Defendant had not produced a single document evidencing the California litigation.

## II. ANALYSIS

Plaintiff charges that Defendant deliberately sought to conceal the California litigation because to disclose those cases would be to destroy its defense here. Plaintiff's entire complaint is predicated on a theory of conflict of interest based on an undisclosed relationship between Defendant and Homestead. Apart from the significance of the litigation itself, Plaintiff claims that documents produced from the California cases would have revealed volumes of evidence supporting its theory of the case here.

Plaintiff argues that Defendant should have produced documents from the California litigation pursuant to our Order granting in part Plaintiff's Motion to Compel documents relating to the association of Defendant and its affiliates with Homestead. Asserting grave prejudice from this eleventh hour discovery, Plaintiff urges the Court to strike Defendant's pleadings and enter a default. Plaintiff claims that no other sanction will sufficiently punish Defendant and deter likeminded third parties.

Defendant contends that none of the evidence available in the files of the California litigation is relevant to the issues on the merits of this action. Defendant further claims that documents from those cases do not fall within the scope of paragraphs eight and nine of Plaintiff's document request or the Order on Plaintiff's motion to compel.

■ In addition, Defendant argues that Plaintiff has failed to meet its burden on each element of the standard for determining whether to impose the sanction of default. The ultimate sanction of default may not be imposed unless the following elements are present: (1) Defendant acted willfully and in bad faith; (2) Plaintiff was prejudiced as a result; (3) no lesser sanction would serve the punishment and deterrence goals of *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), and its progeny. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440 (11th Cir. 1985); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 131 (S.D.Fla.1987). We consider each of these contentions in turn.

### A. *Relevance*

■ The California litigation at issue is comprised of three independent cases. In the first action, Homestead sued Defendant's affiliate, PaineWebber Real Estate Securities, Inc. ("PWRES"), alleging breach of a mortgage loan servicing agreement. *Homestead Savings v. PaineWebber Real Estate Securities, Inc.*, Case No. 85–6894–RFP (N.D.Cal.) (*"Homestead I "*). In the second action, Homestead sued Defendant and various affiliated companies, seeking to hold these Defendants liable for the conduct of PWRES at issue in *Homestead I* under an alter ego theory. *Homestead Savings v. Paine Webber Group, Inc., Paine Webber Incorporated Capital Markets, PaineWebber, Inc., and Paine Webber Mortgage Finance, Inc.*, Case No. 87–1405–RFP (N.D.Cal.) (*"Homestead II "*).

These two actions were settled on June 30, 1987. The various PaineWebber entities, including Defendant and PWRES, brought suit against their insurance carrier seeking recovery of amounts paid in settlement. The carrier also filed a declaratory action in federal court. The federal action was dismissed in favor of state court jurisdiction. *Fireman's Fund Insurance Co., Inc. v. PaineWebber Real Estate Securities, Inc., PaineWebber Group, Inc., PaineWebber, Inc., and PaineWebber Mortgage Finance, Inc.*, 690 F.Supp. 879 (N.D.

Cal.1988) (*"Fireman's Fund"*). As of this date, the state court action is still pending.

The Court has reviewed the pleadings and other record evidence produced to date from the California files. We are convinced that manifestly relevant and material evidence is contained in those files. Indeed, certain pieces of the puzzle, previously missing, are located there. By way of example, we will demonstrate some of the ways in which that evidence might have been used at trial here.

1. Whether Defendant had an undisclosed conflict of interest in its dealings with Homestead and Plaintiff.

The California litigation explored a longstanding business relationship between PWRES and Homestead. Defendant contends that relationship is irrelevant in this action, because PWRES is only an affiliate. It is true that no business relationship between Defendant and Homestead was at issue in the California cases. However, a remarkable fact has come to light through discovery of these cases.

Plaintiff has sued Defendant based in large part on the conduct of Defendant's agent, Butch Tharp. Tharp is allegedly responsible for matching Plaintiff with Homestead, and he allegedly acted as liaison between Plaintiff and Defendant. Plaintiff has always operated under the belief that Tharp was an employee of PaineWebber, Inc. The court file in *Homestead I* reveals for the first time that Plaintiff is mistaken. Tharp was not an employee of PaineWebber, Inc.; he was an employee of PWRES.

This revelation is so remarkable that even if no other new evidence was contained in the California files, the Court would rule in favor of Plaintiff on the issue of relevance. Defendant's arguments to the contrary are unpersuasive. Surely the business relationship between Tharp's employer and Homestead is relevant in determining whether Tharp's advice was tainted by a conflict of interest. Moreover, the connection between Tharp, a PWRES' employee, and Defendant PaineWebber, Inc., would appear to undermine Defendant's argument that those two corporate entities are entirely separate.

2. Background on the interest swap placement.

The relationship between PWRES and Homestead provides some interesting background to the subsequent dealings between Plaintiff and Homestead. Certainly, Defendant could have recommended any number of other financial institutions for the interest swaps with Plaintiff. The jury is entitled to know why Homestead was chosen.

3–4. Homestead's financial condition, and Plaintiff's ability to mitigate damages.

One of the most hotly contested issues between the parties in this lawsuit is the question of mitigation. Defendant argues that even if the interest swaps were ill-advised, Plaintiff could have covered its losses by exiting the swaps. If Defendant is correct, Plaintiff might well be left with, at best, a paper victory—a finding of liability, but only nominal damages. Plaintiff's position is that mitigation was impossible because Homestead was uncreditworthy, and hence no other financial institution would have been willing to take Plaintiff's place.

In *Homestead I*, PWRES argued that it should not be held liable for terminating the loan servicing contract with Homestead, because Homestead was unable to meet its side of the bargain. According to PWRES, the arrangement was disastrous. PWRES' principal theory was management overload in servicing, but it emphasized Homestead's financial losses in the servicing area as well.

For example, in its opening statement, PWRES termed the arrangement a "financial disaster" for Homestead. Moreover, in its pretrial statement, PWRES claimed:

> Evidencing the problems in, and unprofitable operation of, its loan servicing department, Homestead has recently established a $12 million reserve for loan servicing losses. This reserve is the largest loss reserve in Homestead's 99–year history. . . . [Homestead] has advised its

shareholders that it is sustaining huge losses [in servicing]. Moreover, PaineWebber has developed computer analysis of Homestead's servicing portfolio which indicate that Homestead is currently sustaining large losses in its portfolio and would have sustained even larger losses had Homestead purchased additional loans through PaineWebber.

Defendant argues that even though Homestead lost millions of dollars in the servicing area, it made millions of dollars more in other departments, and therefore remained profitable. Defendant argues that creditworthiness is conclusively established by audited financial statements, which Defendant contends demonstrate the creditworthiness of Homestead for purposes of this litigation.

The Court is not persuaded by Defendant's narrow reading of the record in *Homestead I.* California counsel for Defendant and its affiliates testified at the evidentiary hearing that Homestead had made huge profits in the interest transaction area, which offset its losses in the servicing area. Plaintiff might well argue to the jury that Defendant's pairing of Plaintiff and Homestead was an attempt to compensate Homestead for the losses incurred in the servicing area.

More significantly, Plaintiff's experts could testify that any other financial institution considering replacing Plaintiff in the interest rate swaps would assess Homestead's business and management record, and not merely its financial records, before agreeing to assume Plaintiff's obligations. Even if Homestead's financial records demonstrate creditworthiness, a financial institution would hesitate before entering into a long-term business relationship with unstable or incompetent management.

Defendant does not dispute that the California files paint a dire picture of Homestead's management and logistical capabilities, at least in the servicing area. Again, in its opening statement, PWRES argues that Homestead did not maintain a budget. PWRES further claims that Homestead led the nation in customer complaints for loan servicing. The Federal Home Loan Bank Board conducted five special audits, and ultimately barred Homestead from further loan servicing without prior approval. PWRES argued that Homestead had "unbelievable problems with turnover," at one point losing more employees than they could hire. According to PWRES, Homestead lost thirty million dollars on five billion dollars worth of servicing. Ironically, these losses were incurred as interest rates declined and customers refinanced the loans. Subsequently, Defendant and PWRES' employee Butch Tharp suggested that Plaintiff swap loan obligations with Homestead to avoid incurring losses from interest rate fluctuations and the inevitable refinancing that results.

The point to be made here is that mitigation and creditworthiness are not issues to be determined by Defendant's unilateral reading of the evidence. These are issues for the jury. Plaintiff is entitled to present its theories of proof, and Defendant can counter with theories of its own. The finder of fact determines whose position is correct.

5. What PaineWebber, Inc. knew about Homestead's condition and when.

If Defendant possessed information indicating that Homestead was an unsuitable swap partner for Plaintiff, or if Defendant should have reasonably known that Homestead was unsuitable, then Defendant may have breached its duties to Plaintiff by recommending the match or by failing to apprise Plaintiff of the true facts.

6. Impeachment

Defendant plans to rely on statements by Homestead official John Halicky to support its contention that Homestead has been creditworthy at all times material to the current litigation between Plaintiff and PaineWebber, Inc. Yet, PWRES argued in *Homestead I* that Halicky had lied under oath about the volume of servicing complaints against the company. Indeed, Halicky denied that any significant number of complaints had been filed, in direct contravention of evidence which later became known to PWRES through discovery from

federal agencies. Plaintiff is entitled to pursue this line of impeachment.

## B. *Scope of Document Request and Order*

■ Despite the overwhelming importance of the information contained in the California files, Defendant denies that Plaintiff was ever entitled to production through paragraphs eight and nine of the document request and the Order granting in part Plaintiff's motion to compel.

Defendant's first line of defense is that litigation does not constitute an "association," which is the term used in the document request, because litigation is distinctly "anti-associational." That argument is absurd. The obvious purpose of paragraphs eight and nine was to discover the scope and extent of Defendant's relationship with Homestead in order to demonstrate a conflict of interest.

Even if we were to accept Defendant's hypernarrow construction of the request, which is rather self-serving, Defendant would not prevail on this point. The California litigation involved a business association between PWRES and Homestead, even if PaineWebber, Inc. was not a contracting party.

That conclusion brings us to Defendant's next argument, which is that Defendant was not required to produce the documents from *Homestead I* because that action was brought only against an affiliate, PWRES. Certainly any documents from *Homestead II* and *Fireman's Fund* concerning Defendant's relationship with Homestead should have been divulged, because Defendant was a named party to those actions. This Court has previously so held. *See* Order to Show Cause.

Defendant cannot ignore its representation to the Court and to opposing counsel that it would produce all documents in its custody, control or possession responsive to the document request. Because of that representation, the Court did not require Defendant to seek production from its affiliates. Defendant was only required to produce documents from its own files and those files that it controls. This ruling is in keeping with the general principle that "control" for purposes of production means a legal right of access. *Searock v. Stripling*, 736 F.2d 650 (11th Cir.1984).

Both California counsel and Defendant's in-house counsel testified that Defendant enjoyed the right of access to all attorney files for Defendants in the California litigation.[3] Moreover, Defendant's paralegal testified that while she was not sent to pursue discovery in California, she was instructed in her other discovery efforts to search for any documents evidencing a relationship between Homestead and PaineWebber, Inc. *or any of its affiliates.* Defendant in fact produced other documents evidencing relationships between Homestead and PaineWebber affiliates. For these reasons, the Court rejects Defendant's argument that the document request, as modified by the Court's Order on the motion to compel, did not seek affiliate records in Defendant's possession, custody or control.[4]

In any event, Defendant cannot escape the fact that if it had met its obligation to disclose *Homestead II*, or even *Fireman's Fund*, Plaintiff would have been led inevitably to the *Homestead I* litigation. Apart from the obvious relationship between the three cases, each of the docket sheets contains a related case order referring the reader to the principal action. Under these circumstances, even if the Court were inclined to accept Defendant's affiliate theory, which we are not, we would still hold Defendant responsible for Plaintiff's lack

---

**3.** While Mr. Boutin testified that this right of access was limited by attorney-client and work product privileges, we did not find his testimony in that regard to be either credible or correct. Mr. Salzburg, who coordinated production for Defendant in this action, represented both PWRES and PaineWebber, Inc. as liaison to California counsel. Neither Mr. Salzburg nor Mr. Keesal, lead California counsel and a highly credible witness, even hinted at any contraints on Defendant's access to the records.

**4.** Indeed, the document request itself sought all documents in Defendant's custody, control or possession, by its very terms.

of access to *Homestead I*.[5]

## C. *Intent*

Defendant is thus left without any justifiable excuse for its failure to produce documents from any of the three California cases. Even so, Defendant claims that the Court cannot enter a default because Plaintiff has been unable to unearth specific proof of bad faith or intent on the part of Defendant in its discovery violation. Plaintiff responds that the record speaks for itself on the question of intent, and that Defendant should not be permitted to escape the rule simply because no "smoking gun" has been found.

■■■ The sanction of default is an extreme remedy, but it is within a district court's broad discretion to resort to it when appropriate. Default may be imposed when the conduct of the targeted party amounts to "willfulness, bad faith, or ... fault." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976). "Fault" is an amorphous concept, but it has been defined to authorize the sanction of default where counsel has "disregarded" its professional responsibilities in the discovery process or to the court, *see Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 481 (11th Cir.1982), or where counsel's conduct rises to the level of "gross negligence," *see Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir.1979). Thus, where specific proof of intent eludes the movant, default is still appropriate when counsel "clearly should have understood his duty to the court." *Cine Forty-Second Street*, 602 F.2d at 1068.

The Court will separately assess the culpability of in-house and local counsel in applying this standard to the record before us. By way of prelude, we note that the participation of in-house counsel obviates any concern that the Court avoid visiting the sins of the lawyers on the client. In this case, in-house counsel supervised local counsel in the defense of the action, and actively participated in discovery decisions. Moreover, members of in-house counsel hold senior positions in the corporation. Under these circumstances, any fault of in-house or local counsel should be imputed to the client.

### 1. In-house counsel

It should come as no surprise that in-house counsel to PaineWebber, Inc. had complete knowledge of all critical facts underlying the motion to strike. With an insider's vantage point, in-house counsel fully appreciated, perhaps more than local counsel, the significance of the California litigation to this action.

The assistant general counsel, Robert Salzburg, and general counsel, Berson, acted as the principal liaisons for both PaineWebber, Inc. *and* PWRES to the independent California counsel in all three California cases. Salzburg explained that he acted as counsel to PWRES because PWRES did not have its own inside counsel. Moreover, in-house counsel James Treadway signed the joint settlement agreement for *Homestead I* and *II* on behalf of all PaineWebber entities, as counsel to PaineWebber, Inc., and with a power of attorney for PWRES.

At the evidentiary hearing on the motion to strike, Salzburg made a passing attempt to shift the responsibility for production decisions to local counsel, without success. Salzburg was the first to review the complaint and document request. He hired and supervised local counsel. Moreover, Salzburg was the designated records custodian for PaineWebber, Inc. at the deposition conducted pursuant to Federal Rule of Civil Procedure 30(b)(6). If any doubt remains, we note that Salzburg testified that he ratified all of local counsel's actions preceding the motion to strike.

### 2. Local counsel

Local counsel admits knowledge of *Homestead I*, but claims that in-house

**5.** Defendant also argues that the parties limited the scope of production to interest swap transactions only. However, the record is devoid of proof in support of that proposition, and the Court cannot even imagine Plaintiff agreeing to restrict its request to such narrow bounds.

counsel neglected to inform them of *Homestead II* or *Fireman's Fund.* Local counsel, Bennett Falk and Keith Olin, met with California counsel, Peter Boutin, in May 1988. The parties discussed *Homestead I.* Falk claims that he asked Boutin whether PaineWebber, Inc. had any involvement in the litigation and was told that it did not. Boutin does not recall this exchange.

Local counsel did review some of the pleadings from *Homestead I* at the meeting, but they made no effort to search the files for documents responsive to Plaintiff's document request. Salzburg, who arranged the meeting between local and California counsel, testified that counsel did not plan to search the files there. He did not explain what the purpose of the meeting might otherwise have been.

When Falk and Olin returned to Miami, they briefed their colleague O'Bannon Cook on the meeting. Shortly thereafter, Cook defended Butch Tharp's deposition. Cook knew that Tharp was a PWRES' employee; he knew that Homestead had just settled an action against PWRES in California. Yet Cook interfered with Plaintiff's attempts to nail down which corporate entity Tharp was referring to in his deposition, and Tharp was studiously imprecise. Indeed, to deflect the fire from Tharp, Cook promised to review the transcript of the deposition and correct any responses which were incorrect in reference to a PaineWebber entity.

Cook wholly failed to meet his obligations in that regard. Tharp's testimony was entirely misleading to Plaintiff, and Cook did nothing to correct it. In particular, Cook failed to correct the record to reflect that Tharp was an employee of PWRES, and not of PaineWebber, Inc.

When pressed for an explanation, Cook testified that it was a mere oversight, and that he did not intend to hide Tharp's affiliation with PWRES. The Court rejects that testimony. According to Cook, it would have been irrational for him to think that he could hide the PWRES connection, because Plaintiff was bound to be tipped off by other evidence. However, the only other evidence shown in the record on this point is that Plaintiff has done a substantial amount of business with PWRES. The significance of that fact escapes the Court. Plaintiff's connections with PaineWebber entities were not at issue; Homestead's connections were. Lacking critical knowledge of Tharp's PWRES' affiliation, Plaintiff had no reason to pursue PWRES in discovery by subpoena or otherwise.

Moreover, that Defendant almost succeeded in keeping the truth hidden belies counsel's protests that it could not reasonably have thought it could do so. In the face of this argument, Cook claims that he should not be blamed for his lack of specificity to opposing counsel, because, "People just don't talk that way" about corporate entities. In response, the Court would remind counsel that lawyers should "talk that way," especially when they promise to do so.

The Court is also disturbed by the fact that, to this day, no counsel for Defendant has searched the *Fireman's Fund* files for documents sought by Plaintiff in this action. California counsel (Bennett) testified that even when local counsel travelled to California after the first hearing on Plaintiff's · motion to strike, local counsel searched the "Keesal files" only, meaning *Homestead I* and *II,* and not the *Fireman's Fund* files, even though those files were freely available to them.

3. Analysis

The Court has considered the full record and in particular the testimony of Defendant's counsel. Counsel fully appreciated the impact that disclosure of the California litigation would have on this action. Counsel's failure to produce documentation cannot be said to have been a mere oversight, when the evidence withheld is of such importance and no reasonable excuse is offered.

The sequence of events early in the litigation compels the conclusion that counsel made a deliberate choice to bury the evidence and prevent disclosure. In May 1988, local counsel met with California counsel to discuss *Homestead I,* but failed to search the files for responsive doc-

uments. In June 1988, Cook defended Tharp's deposition, and failed to disclose the witness' affiliation with PWRES. In July 1988, Cook represented to the Court that Defendant would produce all responsive documents in its custody, control or possession if the Court would deny Plaintiff's motion to compel production from the files of Defendant's affiliates. Defendant failed to do so.

In short, Defendant did its utmost to keep Plaintiff in the dark, and the truth hidden. Local counsel failed to produce documents from *Homestead I.* In-house counsel failed to produce documents from *Homestead II* or *Fireman's Fund.* Cook diverted Plaintiff from the truth at Tharp's deposition, and then broke his promise to correct the record. Cook manipulated the Court into narrowing Plaintiff's document request to prevent disclosure from affiliates, including PWRES, and then broke his promise to produce records from Defendant's own files. That representation to produce all documents in Defendant's control was the foundation of the Court's Order denying production from affiliates.

Having ensured that Plaintiff would not learn about the California litigation on its own, Defendant then disregarded its duty to produce documentation evidencing that litigation. Indeed, if counsel is to be believed, Defendant also failed to search its own corporate files in New York to determine if relevant documents existed there. Given the record existing at this point, it seems more likely that Defendant simply chose to withhold relevant evidence from New York, as well as California. The Court does not reach that question on the record before us. However, it is abundantly clear that, at a minimum, counsel failed to meet its obligation to search Defendant's corporate and attorney files for responsive documentation.

■ Thus, the Court finds that ample evidence exists in the record to support a finding of willfulness by Defendant and Defendant's counsel in withholding critical evidence in the face of a court order compelling disclosure. Moreover, even if the record did not support a finding of intent,

there can be no question that counsel acted in complete disregard of its responsibilities to opposing counsel and to the Court in the discovery process, either deliberately, or through gross negligence. Accordingly, the Court concludes that it is empowered to choose the sanction of default from its arsenal if the remaining elements of the three-pronged test are met.

### D. *Prejudice*

There can be no question that Plaintiff has been prejudiced as a result of Defendant's conduct. Plaintiff learned of Defendant's discovery violation on the eve of trial. Plaintiff was poised to present its case when volumes of new evidence were uncovered. Considering the complex nature of this litigation, the prejudice to Plaintiff from the wasted trial preparation is substantial.

Moreover, the newly discovered evidence radically alters the nature of Plaintiff's case. We have already demonstrated the materiality of the documents. The import of the evidence previously withheld goes beyond materiality, however. An entirely different player has entered the field— PWRES. Plaintiff may well seek to add PWRES as a party defendant now that Tharp's PWRES' affiliation has come to light. Even if Plaintiff chooses not to pursue that course, Plaintiff will still be forced to pursue avenues of discovery to explore the contours of Homestead's relationship with PWRES in order to support its theory of conflict of interest.

Despite this irrefutable proof of prejudice, Defendant contends that, as a matter of law, Plaintiff cannot be held to have been prejudiced because Plaintiff could have subpoenaed the documents directly from PWRES but failed to do so. Defendant would apparently have the Court excuse its misconduct based on some theory of comparative fault. We decline to do so.

To accept Defendant's position would vitiate the purpose of the sanctions rule. When a party has been ordered to produce documents, and those documents are in its control, Defendant must produce the documents or else face the consequences.

There is simply no other choice. It is not within Defendant's prerogative to complain that Plaintiff might have secured the documents from some other source. Defendant has been ordered to produce them, and Defendant must comply.

To hold otherwise would undermine the authority of the Court and the integrity of the system. Negligence by Plaintiff cannot erase willful misconduct by Defendant in defiance of a court order. Defendant's suggestion to the contrary is unseemly. Defendant's obvious purpose is to divert attention from its own wrongdoing by pointing the finger at Plaintiff.

*Searock v. Stripling*, 736 F.2d 650 (11th Cir.1984), relied on by Defendant, is inapposite. In *Searock*, the Eleventh Circuit held that default is improper when counsel's failure to comply is due to an inability to provide discovery rather than willfulness or bad faith conduct. The documents at issue in *Searock* were in the custody and control of a third party, and not the defendant. Both parties knew this to be the case. Defendant had only volunteered to procure the documents from the third party, but the third party refused to cooperate. In passing, the court observed that the movant might have easily subpoenaed the evidence directly from the third party custodian. That case therefore has no application where counsel fails to produce documents in its possession, custody, or control.

In any event, even if the Court were inclined to adopt Defendant's rather novel comparative fault theory, we would find that it has no application on the record before us. Plaintiff has been more than diligent in pursuing discovery in this case. Plaintiff had no reason to target PWRES with subpoenas for the documents at issue here. Plaintiff did not even know that these particular documents existed. This is not a case in which Plaintiff knew that a third party, and not Defendant, possessed the documents, and yet sat idly by while Defendant refused to procure them. Plaintiff has conducted itself with the utmost good faith, and we decline to penalize Plaintiff for Defendant's wrongdoing.

Based on this analysis, the Court concludes that Plaintiff has made a sufficient showing of prejudice to support entry of default should the Court in its discretion decide to impose it. Plaintiff has also offered an independent argument for a finding of prejudice in the form of financial detriment to the Plaintiff corporation. Defendant strongly opposes Plaintiff's position.

According to Plaintiff, it has been prejudiced by Defendant's intransigence because the day of judgment has been postponed. If Plaintiff is entitled to prevail on the merits, Plaintiff would like immediate access to the fruits of victory. Plaintiff claims that it is unable to sell stock to raise capital. Plaintiff contends that it barely meets the capital requirements of federal law, and that the federal capital requirements are about to be increased. Plaintiff further claims that it is unable to raise money on the capital market. Finally, Plaintiff reminds the Court that the potential judgment in this case represents about one half of its current capital base.

Defendant dismisses Plaintiff's argument as "nonsensical." According to Defendant, the Court should decline to recognize any prejudice to a plaintiff from the lack of access to money damages which the plaintiff may not be entitled to on the merits. Any prejudice on this grounds is, to Defendant, purely speculative.

The Court listened closely to the testimony of BankAtlantic official Alan Levan, both on direct and cross-examination. We listened patiently to counsel's heated arguments on this point. We have concluded that the entire debate, while interesting, is unnecessary. Plaintiff has demonstrated ample prejudice through the time and expense of wasted trial preparation. On a motion for default, no further proof of prejudice is necessary. The Court declines to fashion a rule that would hold a defendant responsible for the very existence of the opposing party due to a delay of trial, even if the delay is due to the fault of the defendant, unless the defendant by its conduct actually sought that result. However, in consideration of a remedy, the Court will

remain sensitive to Plaintiff's financial position.

### E. *Alternative Sanctions*

Plaintiff contends that the Court has no choice but to enter a default because Defendant's conduct was willful and Plaintiff has been prejudiced as a result. We disagree. The Court recognizes that it must consider the availability of lesser sanctions before resorting to a default. Neither party has proposed alternative sanctions here.

■ Default is a draconian measure that should be imposed only in exceptional cases. Even if the court finds that counsel's conduct was willful, default is not mandatory. The court should not be quick to forfeit a party's right to a full and fair trial on the merits. Instead, the court must fashion a sanction that is proportionate to the particular offense, while keeping the deterrence and punishment goals of the rule in mind. At the same time, the court should order compensation to the movant in an effort to cure any demonstrable prejudice.

This determination involves a sliding scale analysis. The more culpable Defendant's conduct, the greater the sanction that is required. If Defendant's conduct is highly culpable, then prejudice to Plaintiff is not the focal point. The judicial system must be vindicated and likeminded parties deterred.

The Court has carefully considered the record in this case in an effort to resolve the competing interests at stake. In our view, this presents a very close case on the issue of default. Upon reflection, however, the Court has determined that default is not an appropriate sanction, because lesser sanctions will serve the punishment and deterrence goals of the rule. The Court is convinced that Defendant acted willfully and in bad faith. However, in our view, a twenty-nine million dollar default would be a disproportionate sanction for violation of a single Order, on the basis of the evidence presented by Plaintiff to date.

This determination is not to be taken as approval of Defendant's conduct. On the contrary, should Plaintiff discover any further evidence of intentional misconduct by Defendant, on this matter or in the future course of the litigation, we invite Plaintiff to renew its motion. Further evidence to that effect may well tip the balance in favor of granting the motion.

### III. CONCLUSION

The Court has concluded that Defendant withheld evidence in bad faith and in violation of a prior Order. Plaintiff has been seriously prejudiced as a result of Defendant's discovery violation. In order to redress Plaintiff and implement these findings on the record, it is hereby ORDERED as follows:

1. Plaintiff's motion to strike is DENIED without prejudice to renew, as outlined above.

2. This cause is hereby specially set for trial on October 9, 1989, with a calendar call to be held on October 4, 1989 at 9:30 a.m. The Court will grant an additional thirty day continuance for good cause shown. The Court stands ready to proceed to trial immediately should Plaintiff elect to decline further discovery.

3. No later than twenty calendar days from entry of this Order, Defendant shall produce all witnesses requested by Plaintiff in Miami for deposition.

4. No later than ten calendar days from entry of this Order, Defendant shall produce all documents from California and New York requested by Plaintiff and responsive to paragraphs eight and nine of the first document request. The documents shall be produced in Miami, or, at Plaintiff's option, shall be made available to Plaintiff in California and New York.

5. Defendant, PaineWebber, Inc., and local counsel, Ruden, Barnett, McClosky, Smith, Schuster & Russell, shall bear equally the reasonable costs of Plaintiff's time and preparation in filing the Motion to Strike and in preparing for the new trial date, including the costs of expedited discovery.

6. Defendant and local counsel shall immediately post a $250,000 cash bond to secure Plaintiff's costs and fees.

7. The amount of costs and fees is to be determined post-trial. The parties shall first attempt to reach a resolution of that issue without the assistance of the Court. Should the parties fail to agree, Plaintiff shall file a motion for costs and fees with supporting affidavits.

8. Defendant shall keep a daily log of all efforts to comply with discovery obligations from this date forward, and shall file on the record a detailed report on these efforts every fifteen calendar days from entry of this Order to the date of trial.

9. Should Plaintiff ultimately prevail on the merits of this action, Defendant shall be liable for triple interest at the statutory rate, to be fixed as of June 19, 1989, and to run from that date forward.

10. All privileges except settlement privilege previously available to Defendant in discovery of the California litigation are considered waived by reason of Defendant's failure to assert the privilege at the time of the document request. The Court is not disposed to consider any further assertion of privilege by Defendant in regard to that discovery. However, the Court will consider an assertion of privilege in an extreme case. The Court further counsels Plaintiff to exercise restraint in the use of privileged documents. The Court will not countenance any objections as to relevance or overbreadth.

11. At trial, the jury will be instructed on Defendant's failure to provide discovery as one factor to be considered in determining Defendant's liability. The Court will address this issue in a subsequent Order. The parties are advised that the Court is of the view that concealment of evidence, like flight from law enforcement, is an appropriate consideration on the merits for the factfinder.

12. By way of this Order, the Court hereby advises the Honorable Robert F. Peckham, United States District Judge, Northern District of California, of Defendant's use of the confidentiality orders entered in actions before Judge Peckham to secrete documents sought on the merits of this action. The Court requests that Judge Peckham immediately reconsider and lift those orders so that Plaintiff may pursue discovery. Defendant shall move for an Order to that effect forthwith.

13. The Court intends to publish this Order in the official reporters to deter future misconduct by Defendant and like-minded third parties.

14. The Court has not excluded the possibility of appropriate fines to be imposed on Defendant and counsel, in addition to the sanctions outlined above. The Court reserves that issue post-trial.

DONE and ORDERED.