890 F.2d 371
 ATLANTIC FEDERAL SAVINGS & LOAN ASSOCIATION OF FT.
LAUDERDALE, Plaintiff-Appellee,
v.
BLYTHE EASTMAN PAINE WEBBER, INCORPORATED, Defendant-Appellant,
Ruden, Barnett, McClosky, Smith, Schuster & Russell, Appellant.
 No. 89-5785.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 11, 1989.
 
 John H. Schulte, Miami, Fla., for Blythe Eastman Paine Webber, Inc.
 Woodrow Melvin, Jr., Miami, Fla., C.B. Rogers, Richard H. Sinkfield, Paul W. Stivers, Atlanta, Ga., for Ruden, Barnett, McClosky, Smith, Schuster & Russell.
 Alan H. Fein and Eugene E. Stearns, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, Fla., for Atlantic Federal Sav. & Loan Ass'n of Ft. Lauderdale.
 Appeal from the United States District Court for the Southern District of Florida.
 Before FAY and KRAVITCH, Circuit Judges, and CASTAGNA*, District Judge.
 FAY, Circuit Judge:
 
 
 1
 Blythe Eastman Paine Webber Inc., n/k/a PaineWebber Inc. ("PaineWebber"), and Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A. ("Ruden Barnett") appeal the imposition of sanctions under F.R.C.P. 37(b). Because we find their appeal of the district court's interlocutory order to be premature, we DISMISS for lack of jurisdiction.
 
 FACTS
 
 2
 BankAtlantic, f/k/a Atlantic Federal Savings and Loan Association of Fort Lauderdale ("BankAtlantic"), brought suit against PaineWebber in August 1987. In its complaint, BankAtlantic alleged that it had hired PaineWebber to be BankAtlantic's financial advisor in 1984 and that PaineWebber had abused its position to derive benefits at BankAtlantic's expense. In particular, BankAtlantic contended that PaineWebber had advised BankAtlantic to undertake transactions known as "interest rate swaps" as a hedge against interest rate risk. Relying on that advice, BankAtlantic allowed PaineWebber to arrange two such swaps with Homestead Savings ("Homestead"), a financial institution in California.
 
 
 3
 BankAtlantic asserts that PaineWebber knew that the swap arrangements would not benefit BankAtlantic and that, further, Homestead was an inappropriate partner for a swap transaction. BankAtlantic believes PaineWebber advocated the arrangement because PaineWebber also serviced Homestead, unbeknownst to BankAtlantic, and Homestead was seeking partners with which to make interest rate swaps. BankAtlantic alleged ongoing losses then totalling $12,341,141.29.
 
 
 4
 The papers served on PaineWebber included a request for production. The two paragraphs which give rise to this appeal asked for:
 
 
 5
 8. All correspondence between you and Homestead Savings.
 
 
 6
 9. All documents relating to your association with Homestead Savings, including, but not limited to any contracts or engagement letters and any written or typed drafts of those contracts or engagement letters between you and Homestead Savings, and any correspondence, internal correspondence, notes or memoranda relating to your association with Homestead Savings.[1]
 
 
 7
 Earlier in the request for production, the terms "you" and "your" were defined to mean
 
 
 8
 the party or parties to which this request is addressed, including its divisions, departments, subsidiaries, affiliates, predecessors, present or former officers, directors, owners, agents, attorneys, and all other persons acting or purporting to act on its behalf, as well as each partnership in which it is a partner.[2]
 
 
 9
 In response to the production request, PaineWebber made a blanket objection to producing any documents protected by the attorney-client privilege or that constituted work product. PaineWebber further objected to paragraphs 8 and 9, describing them as overbroad. Instead PaineWebber agreed to produce correspondence between itself and Homestead related to the interest swap agreements arranged by PaineWebber. PaineWebber filed amended responses and objections to BankAtlantic's request for production in late April 1988. Regarding paragraphs 8 and 9, PaineWebber reiterated its belief that those paragraphs were overbroad in demanding documents "neither relevant nor within the proper scope of discovery" and reasserted the attorney-client privilege and protection of work product. ROA 1-65, Exh. C at 4.
 
 
 10
 BankAtlantic thereupon moved the district court to compel PaineWebber to produce the documents requested. After reviewing the parties' memoranda and holding a hearing on the issue of document production, the district court ordered that PaineWebber produce all the documents within its[3] possession and control sought under paragraphs 8 and 9 from 1983 until the present time. However, the court denied BankAtlantic's motion to compel production of documents from PaineWebber's affiliates and instead recommended that BankAtlantic subpoena those documents directly from the affiliate corporations.
 
 
 11
 After the hearing, discovery and other pre-trial activities ran smoothly until a few weeks before the date set for the trial. At that point, when BankAtlantic had concluded all of its discovery and considered itself ready for trial, one of its paralegals doing a routine NEXIS TM[4] search happened upon a journal article describing an acrimonious litigation battle between Homestead and various PaineWebber Group[5] affiliates, including PaineWebber, involving three separate lawsuits which had taken place from 1985 through 1987 in the Northern District of California. Not even a hint of this litigation had ever been mentioned by PaineWebber to BankAtlantic. Upon further research into the court file in California, BankAtlantic uncovered information regarding Homestead's financial state and the association between Homestead and PaineWebber directly relevant to facts at issue in BankAtlantic's suit against PaineWebber. However, much of the file was unavailable to BankAtlantic, as the case had settled, the court had placed a lot of the file under seal, and the trial and deposition exhibits had been removed. BankAtlantic moved the court to strike PaineWebber's pleadings and enter a default judgment in favor of BankAtlantic as a sanction for what BankAtlantic viewed as contumacious abuses of discovery.
 
 
 12
 PaineWebber countered that it had fully obeyed the trial court's discovery order of July 25, 1988, in which it was required to produce all documents within its control regarding its relationship with Homestead, but not documents regarding the relationship of other PaineWebber affiliates with Homestead. PaineWebber stated that the main body of the California litigation and the bulk of the documents complained of by BankAtlantic concerned the relationship between Homestead and PaineWebber Real Estate Securities ("PWRES"), a completely separate corporate entity from which PaineWebber had no duty to produce documents. According to PaineWebber, PaineWebber and other affiliates were only drawn into the suit two years after it had been because Homestead hoped to recover from them as alter egos for PWRES. PaineWebber accused BankAtlantic of intentionally misleading the court that the California documents were responsive to the request to produce and the grant of the motion to compel in order to cover up BankAtlantic's failure to subpoena the documents from PWRES. Finally, PaineWebber questioned the relevance of the information contained in the California files, asserting that the problems which PWRES had with Homestead were entirely unrelated to the propriety of matching Homestead with BankAtlantic as an interest rate swap partner.
 
 
 13
 BankAtlantic replied that at the very least, PaineWebber had an obligation to provide the documents from the California suit in which it was a named party,[6] the complaint in which alleges that PWRES was a mere shell corporation, controlled and operated by PaineWebber, PaineWebber Group, and other PaineWebber affiliates and through which they conducted their business and commingled their assets. BankAtlantic maintained that PaineWebber had withheld this complaint and the other California documents to sustain the fiction that PWRES and PaineWebber were completely separate entities carrying on separate operations, that PaineWebber had no control or possession over documents relating to the association between Homestead and PWRES, and that the relationship between Homestead and PWRES had nothing to do with the relationship between Homestead and PaineWebber.
 
 
 14
 In its order of July 10, 1989, a footnote that reads: BankAtlantic v. Blyth Eastman PaineWebber, Inc., 127 F.R.D. 224, (S.D.Fla.1989), the trial court determined that PaineWebber had withheld documents from BankAtlantic, in defiance of the court's order, in order to mask the relationship between PaineWebber, PWRES and Homestead. The court found that PaineWebber had, at minimum, the obligation to disclose documentation on the California case in which PaineWebber was a named party, which would have led BankAtlantic to the first suit against PWRES. Further, given testimony by California counsel for PWRES and PaineWebber in-house counsel that PaineWebber had the right of access to attorney files for all defendants in the California litigation, and given that in other areas of discovery by BankAtlantic PaineWebber had produced documents regarding relationships between Homestead and other PaineWebber affiliates, the court found that PaineWebber had custody and control over all the documents relating to the California litigation. PaineWebber therefore had the duty of producing such documents when requested by BankAtlantic and ordered by the trial court to do so.
 
 
 15
 The trial court also addressed PaineWebber's local counsel, Ruden Barnett, which claimed that it did not know of PaineWebber's direct involvement in the California lawsuits. While Ruden Barnett did admit knowledge of the first California suit against PWRES and actually went to California to review some of the pleadings there, Ruden Barnett asserted that, upon advice of California counsel that PaineWebber was not involved in the suit, it did not search for any documents responsive to BankAtlantic's request. The court nonetheless found that Ruden Barnett had aided various PaineWebber and affiliate employees in keeping unclear in deposition exactly who was associated with which PaineWebber entity and to which affiliate the employees referred when answering questions. The court believed that the sequence of events clearly showed Ruden Barnett to have made the decision to bury evidence and keep the truth hidden and to be an accomplice to PaineWebber's scheme to prevail through deception.
 
 
 16
 The trial court declined to enter a default judgment against PaineWebber, deciding that lesser sanctions would serve to punish PaineWebber and deter future disobedience. Instead the court ordered that PaineWebber and Ruden Barnett "bear equally the reasonable costs of Plaintiff's time and preparation in filing the Motion to Strike and in preparing for the new trial date, including the costs of expedited discovery." BankAtlantic, 127 F.R.D. at 235. The amount of costs and fees would be determined post-trial, preferably by agreement of the parties, else by the court on motion of BankAtlantic. The issue of fines to be imposed in addition to costs and fees was also reserved for post-trial determination. If BankAtlantic prevailed on the merits, PaineWebber and Ruden Barnett would further be liable for triple statutory interest running from June 19, 1989. The court required PaineWebber and Ruden Barnett to post immediately a $250,000 cash bond to secure BankAtlantic's costs and fees.
 
 
 17
 The court further deemed all privileges regarding the California litigation, save the settlement privilege, waived due to PaineWebber's failure to adequately assert the privilege at the time of document request. However, the Court allowed that it would consider an assertion of privilege upon a showing of extraordinary need. In the meantime, the court ordered PaineWebber to procure an order from the California court lifting the confidentiality orders protecting the documents in the California litigation. The court also informed the parties that at trial the jury would be instructed on PaineWebber's failure to provide discovery and that the details of this sanction would be addressed in a subsequent order. Finally, the court announced its intention to publish its order in the official reporters to deter future misconduct.
 
 
 18
 PaineWebber filed its notice of appeal on July 24, 1989, and simultaneously moved the trial court to stay the waiver of privilege while the appeal was pending. The trial court in its order dated July 25, 1989, treated PaineWebber's motion as an invocation of the provision in the July 10 order stating that the court would countenance assertions of privilege in the extreme case. The court found that PaineWebber had not properly demonstrated its right to protection on the ground of privilege. The court therefore ordered PaineWebber to provide to BankAtlantic and the court a list of all the documents for which PaineWebber claimed attorney-client or work product privilege, with sufficient description of each document to determine its identity and whether a privilege in fact applied, and with a memorandum in support of PaineWebber's position. The court would compare PaineWebber's list with a list of documents sought prepared by BankAtlantic to ascertain whether any of the allegedly privileged documents were needed by BankAtlantic. If such documents were in fact required, the court would consider in camera inspection of the documents to resolve the issue.
 
 
 19
 Both PaineWebber and BankAtlantic submitted lists of voluminous documents either protected from or necessary to discovery. On August 9, 1989, the court accordingly appointed a special master to issue a report and a recommendation to the court regarding production of the allegedly privileged documents, as the court did not have the time or resources necessary to conduct such a determination with promptitude. On that same day, Ruden Barnett filed its notice of appeal with the trial court.
 
 JURISDICTION
 
 20
 We need not reach the merits of the issues raised on appeal by PaineWebber and Ruden Barnett, as this appeal will be decided solely on the basis of jurisdiction. The sanctions imposed by the district court were included in an order which was clearly interlocutory and thus not appealable under 28 U.S.C. section 1291.[7] Nor was the order of the type granted immediate appellate review by 28 U.S.C. section 1292. In interpreting the final judgment rule expressed in section 1291, however, the Supreme Court has demonstrated that "the statutory requirement of finality is a flexible concept, grounded in the practicalities of the situation." In re Martin Bros. Toolmakers, Inc., 796 F.2d 1435, 1437 (11th Cir.1986). The Court has fashioned three types of exceptions to the final judgment rule: the collateral order doctrine, the doctrine of practical finality, and the exception for intermediate resolution of issues fundamental to the merits of the case.
 
 
 21
 In Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949), the Supreme Court created the collateral order doctrine permitting review of an interlocutory order if it involves a separable claim that has been conclusively determined and is collateral to the merits, too important to be denied review, and too independent of the merits to defer review until a final decision has been rendered. The Court restated its position in Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457-58, 57 L.Ed.2d 351 (1978), allowing review of non-final orders which conclusively determine a disputed question, resolve an important issue completely separate from the merits, and are effectively unreviewable on appeal from final judgment.
 
 
 22
 The doctrine of practical finality derives from Forgay v. Conrad, 47 U.S. (6 How.) 201, 12 L.Ed. 404 (1848), in which the Court held that
 
 
 23
 when the [interim] decree decides the right to the property in contest, and directs it to be delivered up by the defendant to the complainant, or directs it to be sold, or directs the defendant to pay a certain sum of money to the complainant, and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one to that extent, and authorizes an appeal to this court....
 
 
 24
 47 U.S. (6 How.) at 204. See also Ortho Pharmaceutical Corp. v. Sona Distribs., 847 F.2d 1512, 1515 (11th Cir.1988); In re Martin Bros., 796 F.2d at 1437 (review warranted when order directs " 'immediate delivery of physical property and subjects the losing party to irreparable harm' " if review delayed until case concluded).
 
 
 25
 Finally, Gillespie v. U.S. Steel Corp., 379 U.S. 148, 153-54, 85 S.Ct. 308, 311-12, 13 L.Ed.2d 199 (1964), provides that even an order of marginal finality should be accorded immediate review if the question presented is fundamental to further conduct of the case. See also In re Martin Bros., 796 F.2d at 1437.
 
 
 26
 While neither PaineWebber nor Ruden Barnett take the position that all of the sanctions imposed by the district court are appealable at this time, both maintain that some of the sanctions are subject to immediate review. PaineWebber asserts that we have jurisdiction to review the waiver of their right to claim attorney-client and work product privileges. Ruden Barnett urges that we assume jurisdiction over the sanctions requiring it to immediately post half of the $250,000 cash bond and ordaining publication of the court's order in an official reporter. We will address these appeals separately.
 
 
 27
 A. PaineWebber: The Sanction Waiving Privileges.
 
 
 28
 PaineWebber submits that under any of the doctrines espoused by the Supreme Court in Cohen, Forgay and Gillespie, the sanction waiving its right to claim privilege as an objection to discovery of documents related to the California litigation is immediately reviewable by this court. We disagree.
 
 
 29
 First, we find it inconsistent for PaineWebber to assert that the collateral order doctrine, which requires the issue resolved to be completely separate from the merits, and the Gillespie exception, which addresses the review of intermediate issues "fundamental to the further conduct of the case," 379 U.S. at 153, 85 S.Ct. at 311 (quoting United States v. General Motors Corp., 323 U.S. 373, 377, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945)) (emphasis added), can both serve as bases for review by this court. Either the matter of privilege is entirely unrelated to or it is integral to the merits of the case; it is unlikely to be both. More importantly, however, we find that under any of the doctrines of "constructive" finality, PaineWebber's appeal is premature as the trial court has not conclusively determined the issue of waiver of PaineWebber's attorney-client and work product privileges.
 
 
 30
 The collateral order doctrine applies only if the order being appealed conclusively settles a disputed question. Coopers & Lybrand, 437 U.S. at 468, 98 S.Ct. at 2457-58; see also Cohen, 337 U.S. at 546, 69 S.Ct. at 1225-26 (order must finally dispose of a claimed right). The doctrine of practical finality mandates review only when the order calls for " 'immediate delivery of physical property and subjects the losing party to irreparable harm.' " In re Martin Bros., 796 F.2d at 1437 (citing Forgay ). Even under the very broad interpretation of section 1291 found in Gillespie, the Court required the issue presented to have at least marginal finality.
 
 
 31
 PaineWebber argues that the memorandum order issued by the trial court on July 10 "finally resolves the issue of the viability of PaineWebber Inc.'s attorney-client privilege with respect to this litigation and the California litigation." Brief of Appellant PaineWebber Inc. at 13. PaineWebber further maintains that the "irrevocable loss of the attorney-client privilege ... would irreparably harm PaineWebber Inc." and that such destruction presents "questions which are 'fundamental to further conduct of the case.' " Id. at 14. These arguments are unavailing.
 
 
 32
 The district court expressly retained the right to consider "an assertion of privilege in an extreme case." BankAtlantic, 127 F.R.D. at 236. When PaineWebber made an emergency motion for a stay of the privilege sanction pending appeal, the court treated the motion as "invoking that savings clause." Record Excerpts ("RE") at 106 (Order of July 25, 1989). The district court gave instructions to PaineWebber and BankAtlantic on how the court intended to resolve PaineWebber's claim of an exceptional need for its privileges to be recognized, and later appointed a special master when the task proved to be too time- and resource-consuming for the court to undertake unassisted. As far as this court is aware, this process is still underway, and thus far, PaineWebber has not lost one iota of the privilege which it declares was totally destroyed by the district court's July 10 order. There has been no marginal finality, much less irreparable harm or final disposition of a claimed right.[8] This is a case in which the "inconvenience and costs of piecemeal review" far outweigh the as yet non-existent "danger of denying justice by delay." Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950).B. Ruden Barnett: The Cash Bond and Publication Sanctions
 
 
 33
 Ruden Barnett relies primarily on the collateral order doctrine to give this court jurisdiction over its appeal. It argues that the trial court's July 10 order conclusively determined factual findings against Ruden Barnett supporting sanctions, that Ruden Barnett would post immediately a $125,000 cash bond, and that the order itself would be published. Ruden Barnett asserts that the portions of the order sanctioning it are issues completely separate from the merits as it is a non-party law firm that no longer represents PaineWebber. Finally, Ruden Barnett states that, as a non-party, it has no guarantee that it will be able to pursue an appeal upon final determination of the merits of the case and thus the sanctions against it are effectively unreviewable on appeal from final judgment. Ruden Barnett also refers to the practical finality doctrine of Forgay as another source of jurisdiction for this court, declaring that the July 10 order has immediate, otherwise irreparable effects. As with PaineWebber, we find that Ruden Barnett has appealed too hastily.
 
 1. The Collateral Order Doctrine
 
 34
 Ruden Barnett correctly asserts that we have applied the collateral order doctrine to cases in which a non-party was sanctioned by the trial court in a non-final order. See, e.g., Ortho, 847 F.2d at 1515; Robinson v. Tanner, 798 F.2d 1378, 1380-81 (11th Cir.1986), cert. denied, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987). This case differs from those in important respects. In our previous cases where we determined that we had jurisdiction to review sanctions against a non-party, we dealt with situations in which monetary sanctions were conclusively determined and immediately payable or where a non-party might not be able to obtain review at a later date. Neither circumstance obtains here.
 
 
 35
 The sanction requiring Ruden Barnett to put up half of the $250,000 cash bond, while possibly final in and of itself, is hardly a definitive disposition of a disputed question. It is inextricably linked with the sanction of attorney's fees and costs to be determined post-trial. The bond merely guarantees that Ruden Barnett will meet its liability should fees and costs be assessed at the end of the trial. It is not the type of immediately payable sanction that allowed us to find jurisdiction in the Ortho case. In fact, in Ortho we held that "[i]f a money sanction against a non-party is not immediately payable, neither will it normally be immediately reviewable." 847 F.2d at 1518. Here nothing has been paid. The amount of the sanction has not been fixed. The bond is being held, accruing interest, until such time as the amount of the sanction is decided and payment becomes due.[9] When Ruden Barnett's liability, if any, is finally determined, it can then appeal that order.
 
 
 36
 The issue of publication of the July 10 order more closely accords with the requirements of Cohen and the collateral order doctrine. It is a separable claim, conclusively determined and collateral to the merits. Where the demand for our taking jurisdiction fails is on the question of importance. Cohen and Coopers & Lybrand both require that to assume jurisdiction over a collateral order, that order must decide an important issue. Publication of the memorandum order does not constitute an issue of sufficient import to warrant disruptive interlocutory review. Publication simply has made more accessible to interested persons an order that was already a matter of public record. Further, by accepting jurisdiction over this sanction we could not avert any harm feared by Ruden Barnett. The order has been published and disseminated among the legal community. Taking jurisdiction now, even if we were to find the trial court in error and vacate the published order, would be of no more effect than if we were to do so pursuant to a subsequent, more appropriate appeal. When and if Ruden Barnett appeals final determinations of the other sanctions against it, it may properly raise this issue on appeal as well.
 
 
 37
 Ruden Barnett contests that the case may end in a way that would leave it no means for appeal if we do not take jurisdiction now. We do not see this as a likely eventuality. The trial court's July 10 order left several sanction issues outstanding which affect Ruden Barnett. Should the case go to trial and BankAtlantic prevail, the court will adjudge the amount of costs, fees and interest to be awarded to BankAtlantic, or at least approve a resolution of that issue arrived at independently by the parties, from which order PaineWebber may appeal. Even if PaineWebber prevails on the merits, the court may decide that the sanctions are still warranted and the sequence of events stated above would take place. The court may conclude at any point that the sanctions were unjustified and remove them entirely, returning the bond and vacating its published order, in which case there would be no need for appeal. Finally, PaineWebber and BankAtlantic may settle their differences; but the sanctions would remain until the court either removed them or executed them against the appropriate parties. In any case, the court's action would result in an order which could be appealed by Ruden Barnett to this court. In sum, Ruden Barnett will have an opportunity to appeal, one which is not premature.
 
 2. The Practical Finality Doctrine
 
 38
 The type of issue triggering review of interim orders under Forgay are immediately executable judicial decrees deciding property rights. Thus, as delimited by that case, the practical finality doctrine does not apply to the publication sanction. The payment of the cash bond might seem to fit into the Forgay exception were it not for the further explication of the doctrine by the Court:
 
 
 39
 This rule, of course, does not extend to cases where money is directed to be paid into court.... Orders of that kind are frequently and necessarily made in the progress of a cause. But they are interlocutory only, and intended to preserve the subject-matter in dispute from waste or dilapidation, and to keep it within the control of the court until the rights of the parties concerned can be adjudicated by a final decree.
 
 
 40
 Forgay, 47 U.S. (6 How.) at 204-05.
 
 
 41
 We believe that not only will Ruden Barnett not suffer irreparable injury by not securing review of the bond sanction until the final resolution of the monetary sanctions, but that the practical finality doctrine explicitly excluded cases such as this. Ruden Barnett was ordered to pay a bond to the court, not to "pay a certain sum of money to" BankAtlantic. See Id. at 204. The bond did not "decide[ ] the right to ... property;" it ensured that there would be funds with which to pay the fees and costs assessed at the end of trial by keeping the $250,000 "within the control of the court until the rights of the parties concerned [could] be adjudicated by a final decree." Id. at 204-05. We do not have jurisdiction over this case under the practical finality doctrine.
 
 C. Conclusion
 
 42
 Both PaineWebber and Ruden Barnett may file new appeals with this court once the district court has entered truly dispositive orders on the sanctions from which they appeal. We DISMISS this appeal for lack of jurisdiction.
 
 
 
 *
 Honorable William J. Castagna, U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 Record on Appeal ("ROA") 1-65, Exh. A at 5, Atlantic Fed. Sav. & Loan Assoc. v. Blythe Eastman Paine Webber, Inc., No. 89-5785 (11th Cir. filed Aug. 25, 1989) (Plaintiff's Motion to Compel Production of Documents and Memorandum of Law in Support Thereof)
 
 
 [2]
 Id. at 2
 
 
 [3]
 "Its" being Blythe Eastman Paine Webber and the successor company, PaineWebber Inc
 
 
 [4]
 An on-line news service that includes newspapers, magazines and wire services
 
 
 [5]
 The parent corporation of PaineWebber and a plethora of other affiliates
 
 
 [6]
 Homestead Sav. v. Paine Webber Group, Inc., Paine Webber Incorporated Capital Mkts., PaineWebber, Inc. and Paine Webber Mtg. Fin., Inc., No. 87-1405-RFP (N.D.Cal. filed Mar. 30, 1987)
 
 
 [7]
 28 U.S.C. Sec. 1291 (1982) provides that "[t]he courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States, ... except where a direct review may be had in the Supreme Court." The Supreme Court has described a final decision as "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) (citing St. Louis, I.M. & S.R.R. v. Southern Express Co., 108 U.S. 24, 28-29, 2 S.Ct. 6, 8, 27 L.Ed. 638 (1883))
 
 
 [8]
 PaineWebber contends that insofar as the July 25 order did more than stay the production of privileged documents pending appeal, the district court improperly asserted control on an issue over which jurisdiction had already transferred to this court. Any modification of the "final" July 10 order, according to PaineWebber, was "null and void" as the district court acted beyond its authority. Reply Brief of Appellant PaineWebber Inc. at 5 (citing Garcia v. Burlington N.R.R., 818 F.2d 713, 721 (10th Cir.1987) and Suarez-Valdez v. Shearson Lehman/Am. Express, 858 F.2d 648, 649 (11th Cir.1988)). This argument fails as we find that the July 10 order, standing alone, left matters open and unfinished regarding the extent of privilege PaineWebber would be allowed to assert. As the order was inconclusive concerning the scope of privilege, this court's jurisdiction was never properly invoked and the district court was free to "modify" its order in accordance with the proviso found in the July 10 order
 
 
 [9]
 Ruden Barnett further complains that even if the amount of sanction has not been conclusively fixed, it has suffered the immediate loss of approximately $1200, as, pursuant to the Rules of the Southern District of Florida, the bond received no interest for the first 45 days. Such penalty, however, was at most an incidental effect of the court's sanction and does not constitute a remediable sanction in itself. Cf. Korea Shipping Corp. v. N.Y. Shipping Ass'n, 811 F.2d 124, 127 (2d Cir.1987) (harm resulting from lower interest rate received on escrow account than would be earned in investment portfolio redressable at final judgment and insufficient to sustain interlocutory appeal). The loss of the use of its money can be addressed when the entire issue of monetary sanctions is dealt with by the trial court, and an appeal taken from there, if necessary