[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-13782

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 22, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00251-CR-01-BBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL A. DIAZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 22, 2008)**

Before BIRCH, CARNES and COX Circuit Judges.

PER CURIAM:

Michael A. Diaz ("Diaz") appeals his convictions for armed bank robbery, use of a firearm during a crime of violence, and possession of a firearm by a convicted felon. On appeal, Diaz argues that his waivers of his rights to counsel and to a jury were not knowing and voluntary. After reviewing the record and the parties' briefs, and with the benefit of oral argument, we conclude that Diaz did not knowingly waive his right to a jury trial.[1] Accordingly, we VACATE Diaz's convictions and REMAND.

## I. BACKGROUND

Armed, Diaz twice robbed the same Atlanta bank on different dates in 2004. He was arrested by officers of the Atlanta Police Department as he fled from the bank after the second robbery.[2] By a superseding indictment, Diaz was charged with two separate counts of armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d), two counts of using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).

---

[1] Because we remand this case to the district court based upon our conclusion that Diaz's jury trial waiver was invalid, we do not address whether or not Diaz validly waived his right to counsel. However, the district court is directed to revisit this matter in light of our opinions in Jones v. Walker, ___ F.3d ___ , No. 04-13562, (11th Cir. August 20, 2008) (en banc) and United States v. Garey, ___ F.3d ___, No. 05-14631 (11th Cir. August 20, 2008) (en banc).

[2] At the time Diaz was arrested, he was on supervised release for a prior conviction for felon in possession of a firearm in the Eastern District of Louisiana.

Diaz's initial counsel had retained a mental health expert and requested a continuance because he believed that Diaz was suffering from a mental illness. Diaz sent a letter to the district court, in which he complained about his counsel. At a hearing regarding Diaz's letter, Diaz stated that his name was actually D'Ineiehaimaye D'Inemani, not Michael Diaz, and he sought to discharge his counsel. Diaz's counsel explained to the court that, according to Diaz, after the dates of the attempted robberies, a personality named D'Ineiehaimaye D'Inemani had been "re-earthed" into the body formerly occupied by Michael Diaz. Therefore, while Diaz may have committed the crimes when his personality inhabited the body, D'Ineiehaimaye D'Inemani claimed to be innocent of the charges. The district court permitted Diaz's counsel to withdraw and substitute another federal defender, Timothy Saviello ("Saviello") to represent Diaz.

The court held a hearing to determine whether Diaz was competent to stand trial. Dr. Michael Hilton ("Hilton"), a forensic psychiatrist who evaluated Diaz at defense counsel's request, testified that his evaluation included an three-hour interview with Diaz, but he did not administer any written or oral tests. During the interview, Diaz said that he was an individual called "Ieh," and that he had experienced roughly six personality changes since his adolescence. R5 at 10. According to Diaz, each new personality was imbued only the information known

3

by the preceding personality. Hilton testified that Diaz either truly believed that these personality changes had occurred, or that Diaz spent a "tremendous amount of time memorizing these characters in anticipation of" fabricating a mental illness. Id. at 11. Hilton concluded that Diaz was expressing a true belief. Id. at 18. Hilton assessed Diaz's intelligence as generally average and that his IQ was at the low end of the average range. Hilton was asked for his reaction to a report prepared by a government expert which assessed Diaz's IQ at 79. Hilton opined that an individual with such an IQ normally would not be able to convincingly fake a mental illness, though Hilton conceded on cross-examination that it was possible that Diaz fooled him into diagnosing him as schizophrenic. He testified that he believed that there was a good chance that Diaz was mentally ill and showed signs of malingering.

Upon questioning by the district court, Hilton stated that Diaz could recount the events that resulted in the charges against him, and Hilton agreed with the district court that Diaz had "a reasonable degree of rational understanding about what's going on, why he's in the situation he's in." Id. at 52. Saviello then informed the court that Diaz had prepared several letters that he wished to read. Diaz began by reaffirming that his true name was D'Ineiehaimaye D'Inemani. Id. at 56. He then read two letters, which were about an entity called "D.I." Id. at 58-

4

64. In another letter, Diaz claimed that he had not been examined by qualified, impartial doctors, and had not received professional representation. In a final letter, Diaz stated that Hilton's report was fair but the report of the government's expert was forged and contained lies.

The government called Dr. Jorge Luis, a Bureau of Prisons forensic psychologist, who had examined Diaz over a one-month period by order of the court. Luis testified that Diaz refused to acknowledge himself as Michael Diaz and claimed to be "another entity" during their initial meeting. Id. at 78-80. Luis gave, or attempted to give, a number of oral and written tests to Diaz. According to Luis, the results of Diaz's I.Q. tests placed him in the "slightly below average" to "average" range of intelligence, depending on the test. Id. at 95-97. Test results also showed that Diaz was not suffering from neuropsychological damage or disease. An initial test indicated that Diaz may have been malingering, and a follow-up test indicated a 100 percent chance that Diaz was fabricating his symptoms. Id. at 97-104. Luis also tested Diaz's understanding of trial proceedings and his competency to stand trial. The results of that test indicated Diaz was incompetent, but they also indicated that he was feigning incompetence. Id. at 112-13. Luis diagnosed Diaz with malingering and with a personality disorder not otherwise specified, with schizotypal and antisocial features. Luis

5

opined that Diaz's personality disorder did not affect his competency to stand trial or to assist in his defense.

Following this hearing, Saviello submitted a brief arguing that Diaz was not competent to stand trial, and that Hilton's findings and conclusions carried more weight than Luis's because Hilton used a more complex methodology. Through counsel, Diaz moved to substitute his attorney, arguing that his attorney had provided insufficient representation. The district court denied Diaz's motion for new counsel, finding that Diaz had failed to state good cause for a new lawyer, and that he did not have the right to be represented by a particular lawyer. The district court also ruled that Diaz was competent to stand trial, finding that Diaz understood the nature and consequences of the proceedings against him and that Diaz could assist properly in his defense.

In pretrial discussions on the day of Diaz's trial, Diaz stated that he had motions to present. He began with a motion of "identity mix-up." R7 at 4. Diaz again stated that his name was D'Ineiehaimaye D'Inemani and said that he was innocent of the charges against Michael Diaz, who was dead, having "lived out transitional transformation until the next one, until D'Ine's entity transcendents even in incarnation and re-Earth experience." Id. Diaz next moved to dismiss Saviello and to proceed pro se, explaining that he did not want to be "under the

6

wardship of the court." Id. at 6. The district court responded that Diaz was "accused of a very serious crime" and that the court was preparing to have a jury hear the evidence against him, and asked whether Diaz had any legal training. Id. at 7. Diaz did not answer the question. The court again asked whether he had "any legal training whatsoever," and commented that this was a "very serious proceeding with very serious consequences" and that he would be "making a terrible mistake to try to proceed without a lawyer." Id. Diaz responded that his ability to speak on his own behalf was being "neglected" and that his ability to prepare a proper defense team was limited. Id. at 7-8.

The court then asked Diaz directly whether he was requesting to proceed without a lawyer. Diaz returned to a discussion of his motion regarding jurisdiction and did not answer the question. Saviello informed the court that Diaz previously had stated his desire to represent himself and argued that, under Godinez v. Moran, 509 U.S. 389, 113 S. Ct. 2680 (1993), Diaz was competent to waive his right to counsel since he had been found competent to stand trial. R7 at 10-11. The district court then stated that, if it was Diaz's request to proceed pro se, based on the Godinez standard, Diaz could do so, but Saviello would remain as stand-by counsel. Id. at 14.

The district court then told Diaz that it would ask Saviello to help him pick a jury, and Diaz stated that he did "not want any juries infringed upon D'Ine because they are not of D'Ine peers or D'Ine peoples but the plebeians and colonizers [] of this occupational imperialistic power structure. I do not want no juries infringed upon me." Id. at 16-17. The district court asked Diaz if he was saying that he wanted to proceed with a bench trial instead of a jury trial, and Diaz responded that he did "not want no jurors, any jurors infringed upon D'Ineiehaimaye." Id. at 17. The district court asked Diaz to explain what he meant by "infringed upon," and Diaz responded that he meant "forced upon D'Ine" and that it was not his will "to have this mockery of justice." Id. Diaz stated that he understood the court's explanation that, if there was no jury to try the case, then the district court would try it. Id. Again, the district court asked Diaz if he wanted to proceed with a bench trial instead of a jury trial, and, again, Diaz responded that he did not want "any jury infringed upon D'Ine." Id.

After explaining the jury selection process, the role of the jury, and what Diaz's right to a jury trial entailed, the court stated that, Diaz could waive his right to a jury, although the court wanted him to understand that his right was guaranteed by the Constitution. Id. at 17-18. Diaz responded that he did not recognize the court's governing authority over D'Ineiehaimaye. Id. at 18. The

8

district court considered Diaz's statement non-responsive and stated that Diaz had to make a clear waiver of his right to a jury. Id. The district court then told Diaz that, "unless you can tell me that you understand your constitutional right to a jury and that you want to waive it, I'm going to bring the jury up here." Id. at 18-19. Diaz again responded that he did not recognize the district court's authority. Id. at 19. The district court then stated that Diaz would have the opportunity to prove to the jury that he was not the person who had committed the robberies and further stated that Diaz's waiver of his right to counsel was a "very serious thing" and opined that eventually, during the trial, Diaz would "see how badly" he would need Saviello's assistance. Id.

The district court suggested to Diaz that he should allow Saviello to make the opening statement when the jury arrived. Id. at 80. Diaz reiterated his position that any jurors would be an infringement upon D'Ine because they were not of his peers or people. The district court again asked Diaz if he wished to have a bench trial instead of a jury trial, and Diaz responded, "Well, I understand what you're saying as far as my right to waive it, but, again, I don't recognize the court as having –" Id. The district court interrupted Diaz and stated that it had to be "one or the other," and Diaz responded that he was "firm on the one and I don't wish the jurors to be infringed upon." Id. at 81. Saviello stated that he discussed the

9

right to a jury with Diaz he believed that Diaz understood that right. Id. The court then asked Saviello if Diaz was waiving that right and if Saviello thought Diaz understood what he was waiving. Id. Saviello responded that he discussed the rules of the court and his rights under the Constitution with Diaz, and he believed that Diaz understood, but did not feel bound by those rules or the Constitution. Id. at 81-82. Saviello stated that Diaz would be willing to give up his right to a jury, but Diaz did not want his waiver to be misconstrued as an acquiescence to the authority of the district court. Id. at 82. The district court asked Diaz if his attorney "sa[id] that pretty well;" Diaz responded "[y]es" and also asked to have a hearing at the International World Court. Id.

The district court informed Diaz that the waiver of his right to a jury must be in writing, provided a waiver form to Diaz, and asked Saviello to review it with him. Id. at 83. Saviello stated that Diaz would not sign the form because Diaz believed that his written motion and the ensuing discussion sufficed to waive his right to a jury trial, and Diaz was not inclined "to engage in a contract." Id. at 83-84. The district court responded that Diaz's written motion did not include a clear enough request to waive his right to a jury. Id. at 84. Diaz responded that he would not sign the document because, by doing so, he would be surrendering to the court's jurisdiction. Id. He again said that he did not wish to have those jurors

10

infringed upon him, since they were not of his people or peers. Id. After the court reiterated that Diaz's reference to his motion was insufficient for Diaz to waive his right to a jury Diaz responded, "It is my right. It is my right. I would think that would be enough." Id. at 85. The district court stated that "for me it's not," to which Diaz responded, "In other words, my right is just being denied?" Id. The district court said that Diaz simply had failed to acknowledge that he was advised of his right and understood what it meant to waive it. Id. Diaz then indicated that he had been advised of his right to a jury and acknowledged that it was a constitutional right. Id. The district court asked Diaz if wanted to proceed without a jury, and Diaz responded, "Exactly – no. I don't want a jury infringed upon." Id. Diaz then repeated his position that the district court did not have governing authority and that he wished to proceed in the International World Court. Id. at 85-86.

The district court obtained signatures to the court's jury waiver form from Saviello and the government and then asked Diaz if he understood that the trial would proceed without a jury. Id. at 86. Diaz responded, "I understand that my right – well, yeah, I understand what you're saying." Id. at 86-87. The district court again asked Diaz if he was stating in his motion that he did not want a jury, and Diaz responded, "What I'm saying is that they are not of the D'Ineiehaimaye

11

peers or D'Ineiehaimaye peoples." Id. at 87. When the district court repeated its question, Diaz stated, "I'm saying that I don't recognize the jury, as well as the court, because they aren't part of the same." Id. The district court then stated, "You can have a jury or you cannot have a jury. Which do you want?" Id. Diaz responded, "I can have a jury. I can have a jury. I mean you want me to choose . . . to be prosecuted?" Id. at 88. Asked again whether he wanted to have a jury, Diaz replied that he did not recognize the jury or the jurisdiction of the district court, and further stated, "I don't recognize the jury. I'm not saying I don't want to have a jury." Id. The district court told Diaz that he could have a jury, and Diaz again said that he wanted to be heard by the International World Court where his people and peers would render assistance and support. The district court again asked if he wanted a jury and Diaz pleaded the Fifth Amendment, claiming that he was being entrapped. Id. at 88-89. After an off-the-record discussion with the government and Saviello, the district court found that Diaz's written motion constituted a waiver of his right to a jury and expressed concern that it would be error to force Diaz to have a jury when he did not want one. Id. at 89. The district court acknowledged that Diaz had not signed the waiver but found that he had made the request orally and in writing. Id. Diaz objected to Saviello's signature on the waiver form on the grounds that Saviello did not represent him. Id. at 90.

12

The district court proceeded to hold a bench trial and found Diaz guilty of all five counts of the superseding indictment. The district court again determined that Diaz did not suffer from any mental disease or defect that rendered him unable to understand the nature and consequences of the proceedings. The district court also noted that, even though Diaz had relieved Saviello as his counsel, they had consulted throughout the trial, including each time the district court asked Diaz if he had an objection, wished to cross-examine a witness, or wished to make a statement. The district court subsequently sentenced Diaz to a total term of 584 months of imprisonment. This appeal followed.

## II. DISCUSSION

Diaz argues that the record is insufficient to establish that he knowingly and voluntarily waived his right to a jury trial. Diaz argues that, absent a written waiver, his request that a jury not be "infringed" upon him was an insufficient waiver of his right to a jury trial, because his statements in the record imply that he objected to the composition of the jury, not the jury itself, and the court did not discuss fully the role of the jury in the trial.

"The adequacy of a jury trial waiver is a mixed question of fact and law which we review de novo." United States v. Farris, 77 F.3d 391, 396 (11th Cir. 1996). A defendant may waive his Sixth Amendment right to a jury trial when: (1)

he gives "express, intelligent consent"; (2) the government consents; and (3) the waiver is "approved by the responsible judgment of the trial court." Adams v. United States ex rel. McCann, 317 U.S. 269, 277-78, 63 S. Ct. 236, 241 (1942). The right to a jury is a personal right that the defendant himself must waive. United States v. Joshi, 896 F.2d 1303, 1307 (11th Cir. 1990). Whether a defendant's waiver of a jury trial is intelligent and knowing depends on the "unique circumstances of each case." Adams, 317 U.S. at 278, 63 S. Ct. at 241. Further, under the Federal Rules of Criminal Procedure, "[i]f the defendant is entitled to a jury trial, the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves." Fed. R. Crim. P. 23(a). We have explained that

> the purpose of Rule 23(a) is to ensure that a criminal defendant is aware of his jury right before waiving it and that any waiver is personal and unequivocal[;] . . . we require strict compliance with the rule. Thus, reversal is warranted where there is no written waiver signed by the defendant in the record and the defendant asserts either that he was unaware of his jury right or that he did not consent to its waiver. This is not to say that [we] will invariably grant relief for purely technical violations of the rule, as where a defendant knowingly acquiesced in a waiver which was never reduced to writing. If the defendant admits, or the government plainly demonstrates, that at the time of the waiver the defendant was not ignorant of his jury right and consented to the waiver, reversal would not be in order, for the defendant cannot complain on appeal of an alleged error invited or induced by himself.

United States v. Garrett, 727 F.2d 1003, 1012 (11th Cir. 1984).

In this case, Diaz did not sign the district court's jury trial waiver form; the form was signed only by Saviello, who was acting as stand-by counsel at the time, the government, and the district judge. Prior to trial, Diaz had made a motion in which he challenged the district court's subject matter jurisdiction and requested not "to have these jur[o]rs infringed upon D'Ine as they are not of Ine peoples nor peers." R2-103 at 1. Therefore, we consider whether or not Diaz effectively waived his right to a jury trial through his written motion. Based on Diaz's motion, and his pre-trial statements regarding that motion in the district court, we find that Diaz was objecting to the composition of the persons in the jury pool. First, Diaz appears to have attempted to waive his right to a jury trial, but then, when repeatedly asked if he wanted to proceed without a jury, Diaz responded: (1) "Exactly – no. I don't want a jury infringed upon"; (2) "What I'm saying is that they are not of the D'Ineiehaimaye peers or D'Ineiehaimaye peoples"; and (3) "I'm saying that I don't recognize the jury, as well as the court, because they aren't part of the same." R7 at 85, 87. When asked whether or not he wanted to have a jury trial, Diaz questioned whether the district court was allowing him to choose whether to be prosecuted. Id. at 88. Asked again whether he wanted a jury, Diaz

15

responded, "I don't recognize the jury. I'm not saying I don't want to have a jury." Id.

When considered as a whole, the court's discussion with Diaz about his right to jury trial reflects that Diaz was unsatisfied with the persons that would form the jury, not that he wanted a bench trial. We recognize that isolated portions of the record could be viewed as a waiver of Diaz's right to a jury trial. For example, when viewed apart from the remainder of the hearing, Diaz's agreement with his attorney's statement that he was willing to waive his constitutional right to a jury appears to be an unequivocal waiver. However, even after agreeing with counsel's statement, Diaz again indicated that he did not wish to have those jurors infringed upon him since they were not of his people or peers, which to us suggests that Diaz's continuing objection was to the composition of the jury, not the use of a jury as the factfinder at trial. See id. at 84. Diaz did not sign the waiver of jury form, and the district court did not pursue the issue in enough detail to enable us to discern whether or not Diaz was attempting to waive his right to a jury trial through his written motion. Accordingly, we conclude that Diaz did not validly waive his right to a jury trial.

16

### III. CONCLUSION

Diaz appeals his convictions for armed bank robbery, use of a firearm during a crime of violence, and possession of a firearm by a convicted felon. Diaz argues that his waivers of his rights to counsel and to a jury were not knowing or voluntary. We conclude that Diaz did not effectively waive his right to a jury trial because he did not sign the district court's jury waiver form, and his motion and statements regarding his intent to waive his right to jury trial were equivocal. Accordingly, we VACATE Diaz's convictions and REMAND this case to the district court. **VACATED AND REMANDED**