[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15421

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 12, 2011
JOHN LEY
CLERK

D. C. Docket No. 04-00251-CR-BBM-1

UNITED STATES OF AMERICA,

                                                                Plaintiff-Appellee,

versus

MICHAEL A. DIAZ,

                                                                Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 12, 2011)

Before HULL and MARCUS, Circuit Judges, and COOKE,[*] District Judge.

HULL, Circuit Judge:

_____

[*]Honorable Marcia G. Cooke, United States District Judge for the Southern District of Florida, sitting by designation.

Defendant Michael Diaz appeals from the district court's order granting permission for the government to medicate him involuntarily with anti-psychotic medication to render him competent to stand trial for two armed robberies and other firearm offenses. After review and oral argument, we affirm. Diaz has not shown that the district court clearly erred in finding that the government satisfied its burden under Sell v. United States, 539 U.S. 166, 123 S. Ct. 2174 (2003), and in granting permission to medicate Diaz involuntarily.

## I. BACKGROUND

### A. First Competency Hearing and Trial

In July 2004, a superseding indictment charged Diaz with: (1) armed bank robbery on January 27, 2004, in violation of 18 U.S.C. § 2113(a) and (d) ("Count 1"); (2) carrying and using a firearm in connection with a crime of violence—i.e., armed bank robbery, as charged in Count 1—in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(A)(iii) ("Count 2"); (3) another armed bank robbery on April 8, 2004, in violation of 18 U.S.C. § 2113(a) and (d) ("Count 3"); (4) using a firearm in connection with a crime of violence—i.e., armed bank robbery, as charged in Count 3—in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(A)(iii) ("Count 4"); and (5) possession of a firearm as a convicted felon, in violation of 18

2

U.S.C. §§ 922(g) and 924(a)(2) ("Count 5"). At the time of his arrest, Diaz was on supervised release for a prior federal conviction for being a felon in possession of a firearm in the Eastern District of Louisiana.

On March 7, 2005, the district court ordered the Bureau of Prisons ("BOP") to conduct a psychiatric examination of Diaz to determine his competency to stand trial. From April 4 to May 4, 2005, and again from November 14, 2005 to January 3, 2006, Diaz was evaluated by Dr. Jorge Luis of the Federal Detention Center in Miami, Florida ("FDC Miami"). Dr. Luis conducted extensive interviews with Diaz and administered several psychological tests, including tests to assess malingering psychological problems. Dr. Luis concluded that Diaz was competent to stand trial.

On February 23, 2005, at the request of Diaz's counsel, Diaz was evaluated by Michael Hilton, M.D., a psychiatrist. Dr. Hilton's report indicated that there was limited information regarding Diaz's previous mental health treatment. During his interview, Diaz provided Dr. Hilton with an explanation of his experiences beginning at age 13, whereby "Michael Anthony Diaz was vanquished" and "subsequently took on a new identity of 'MAD-one.'" At age 23, Diaz changed identities again and "JahI" took over "as a result of spiritual growth." JahI was then vanquished and "Ichaelimaye," or "Iko," was "re-earthed." Diaz

3

later became "Ineyah Imaye," or "Yah," and then later "Ieh" was "re-earthed." Dr. Hilton noted that Diaz's "conversation flow is just about impossible to follow," determined that Diaz was suffering from "undifferentiated schizophrenia," and opined that he was not competent to stand trial.

In October 2005, the district court conducted a hearing at which both Dr. Luis and Dr. Hilton testified.[1] The district court found Diaz competent to stand trial. Diaz later moved to dismiss his attorney and proceed pro se. The district court granted Diaz's motion, but ordered that his attorney remain as stand-by counsel during the trial.

In a March 2006 bench trial, Diaz represented himself. The district court found Diaz guilty of all five counts in the superseding indictment, and sentenced him to a term of 584 months' imprisonment. Diaz appealed. In August 2008, this Court concluded that Diaz did not knowingly waive his right to a jury trial, and vacated his convictions as to all five counts. See United States v. Diaz, 540 F.3d 1316 (11th Cir. 2008).

## B. Second Competency Hearing

At some point Diaz was placed at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg"). The staff at USP Lewisburg

---

[1]More details about Dr. Hilton and Dr. Luis's testimony are provided in this Court's opinion in United States v. Diaz, 540 F.3d 1316 (11th Cir. 2008).

4

referred Diaz to a telepsychiatry clinic for a psychiatric consultation to determine whether he suffered from mental illness and would benefit from medication.[2] On July 24, 2008, Dr. James K. Wolfson, located at the Mental Health Evaluation Unit at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield medical center"), conducted a telepsychiatric evaluation of Diaz. Dr. Wolfson concluded that Diaz was psychotic, substantially impaired, and should take anti-psychotic medication. Diaz refused to take medication voluntarily. Dr. Wolfson opined that Diaz would not meet the criteria for involuntary medication, and, therefore, did not prescribe medication for him.

On December 31, 2008, Diaz was admitted to Springfield medical center. Diaz was initially placed in the open population, but was later placed in a locked unit. From December 31, 2008 to January 31, 2009, Diaz was evaluated by Dr. Christina Pietz, a forensic psychologist at Springfield medical center. Dr. Pietz's forensic report, dated February 3, 2009, stated that Diaz refused to participate in all clinical interviews, refused to complete psychological testing, and refused to answer any questions about his background.

On May 6, 2009, the district court conducted a second competency hearing at which Dr. Pietz testified. In a written order, the court found that Diaz was

---

[2]"Telepsychiatry" is a method of treating patients remotely via video screen. It is used if the institution housing a patient does not have access to psychiatrists on-site.

incompetent to stand trial. The court's order directed that (1) Diaz be committed to the custody of the U.S. Attorney General and (2) the Attorney General hospitalize Diaz for a maximum period of four months to determine whether there was a substantial probability that, in the foreseeable future, he could attain the capacity to stand trial. The court recommended that Diaz be returned to Springfield medical center so that he could have continuity of treatment and surroundings.

## C.    Diaz's Re-Admission to Springfield Medical Center

On May 21, 2009, Diaz was re-admitted to Springfield medical center. On May 27, 2009, he received advance written notice that a Due Process Involuntary Medication Hearing would be held on June 3, 2009. After a hearing, Dr. Carlos Tomelleri concluded that he could not approve involuntary medication because Diaz was not likely to cause harm to himself or others. Dr. Tomelleri's report stated that: (1) Diaz said that he was not mentally ill and "did not wish to consider treatment with psychotropic medication"; (2) since Diaz's admission to Springfield medical center, Diaz "has refused psychological testing, [and] has refused to attend required orientation proceedings"; and (3) psychotherapy and similar options would be futile. Dr. Tomelleri's report recommended a treatment of psychotropic medication, which would have a "substantial probability" of restoring Diaz to competency to proceed with his legal case. However, given that Diaz did not pose

6

a danger to himself or to others, the BOP could not involuntarily medicate Diaz without a court order.

The district court next scheduled a hearing pursuant to the Supreme Court's decision in Sell v. United States, 539 U.S. 166, 123 S. Ct. 2174 (2003), which addressed involuntary medication for the sole purpose of rendering a defendant competent to stand trial.[3]  Sell laid out these four standards the government must satisfy for involuntary medication to render a defendant competent to stand trial: (1) important government interests must be at stake, (2) involuntary medication must significantly further the state interests in assuring a fair and timely trial, (3) involuntary medication must be necessary to further the state interests, and (4) administration of the medication must be "medically appropriate, i.e., in the patient's best medical interest in light of his medical condition."  Id. at 180-81, 123 S. Ct. at 2184-85.  Because this appeal turns largely on whether the district court

---

[3]In Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028 (1990), the Supreme Court held that the Due Process Clause permits a state to treat a prison inmate with anti-psychotic drugs against his will when the inmate has a serious mental illness, is dangerous to himself or others, and treatment is in his medical interest.  Id. at 227, 110 S. Ct. at 1039-40,  In Sell, the Court stated that "[a] court need not consider whether to allow forced medication" to render a defendant competent to stand trial "if forced medication is warranted for a different purpose, such as the purposes set out in Harper related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk."  539 U.S. at 181-82, 123 S. Ct. at 2185.  A court, when considering whether to approve involuntary medication to render a defendant competent to stand trial, "should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other Harper-type grounds; and, if not, why not."  Id. at 183, 123 S. Ct. at 2186.

erred in finding the government satisfied two of these factors, we review in great

detail the evidence at the Sell hearing.

**D.     Government's Witnesses at Sell Hearing**

On September 8, 2009, the district court conducted the Sell hearing, during

which counsel represented Diaz.[4]  Addressing the court, Diaz personally stated that

he retained "sovereign immunity" from the judicial proceedings, was not a citizen

of the United States and did not adhere to the laws of the United States, and

invoked his right against self-incrimination.

The government responded that it had a strong and important interest in

bringing Diaz's case to trial because of the violent nature of his crimes–two armed

bank robberies and a felon-in-possession charge–and because of its interest in a

speedy trial.  The government presented evidence on the Sell factors.

1.     Dr. Christina Pietz

The government first called Dr. Pietz to testify.  Dr. Pietz, a psychologist, is

Diaz's primary clinician at Springfield medical center.  Dr. Pietz opined that Diaz

suffers from paranoid schizophrenia.  On May 21, 2009, Diaz was re-admitted to

Springfield medical center and, since being re-admitted, Diaz has refused to be

---

[4]On the day of the Sell hearing, Diaz's defense attorney, Timothy R. Saviello, requested a continuance until later in the day to prepare for the hearing.  The district court granted his request for a continuance until 1:00 pm that same day.

8

interviewed by Dr. Pietz and has refused to take any medication. Diaz has also refused the staff's attempts to administer medication to him and refused to participate in therapy sessions or undergo any other type of treatment.

Because Diaz would not take medicine, Springfield medical center conducted the due process hearing to determine whether they forcibly could medicate Diaz. After this hearing, Dr. Tomelleri found that (1) Diaz suffers from a mental illness that requires medication, but (2) Diaz is not dangerous to himself or others, and (3) thus the medical center staff could not forcibly medicate him.

Dr. Pietz opined that the administration of anti-psychotic drugs is medically appropriate for Diaz because his condition will not improve and could deteriorate if he does not receive medication. Dr. Pietz pointed out that Diaz's condition has worsened over the past few years. Dr. Pietz concluded that there are no alternative treatments that would be effective in treating Diaz's disorder. The potential alternative treatment options are individual therapy, group therapy, or recreational therapy. However, Diaz is not a candidate for those types of treatments due to his demeanor, his refusal to cooperate with mental health professionals, and his inability to function in an open group population. Diaz was not offered opportunities to participate in individual or group therapy because those therapies were not an option so long as he was unmedicated and held in a locked unit.

9

In any case, Dr. Pietz has no reason to believe that Diaz would participate in a competency restoration program or any other form of group therapy. While at USP Lewisburg, Diaz was offered an opportunity to participate in a program called the "Challenge Program," designed to help inmates after they are released into society, but Diaz refused to participate. Dr. Pietz also explained that medical center staff had attempted to educate Diaz regarding the benefits of anti-psychotic medication, but that he had resisted these efforts.

Dr. Pietz further testified that the medication that she and Dr. Robert Sarrazin, the medical center's chief of psychiatry, recommended for Diaz has a substantial likelihood of rendering Diaz competent to stand trial. For over 19 years, Dr. Pietz has treated individuals who were found to be incompetent to stand trial. Between 60% and 70% of these patients were restored to competency with medication. As for the individuals who did not attain competency, Dr. Pietz explained that some of those individuals suffered from cognitive defects, such as mental retardation, which rendered them unresponsive to medication. Dr. Pietz stated that if the medical staff cannot treat Diaz with medication, they will never be able to restore his competency to stand trial.

Addressing the potential side effects of anti-psychotic medication, Dr. Pietz testified that such medication will likely improve Diaz's ability to think in a

10

rational and organized manner and will likely decrease his paranoia and irritability.

As a result, Dr. Pietz believes that anti-psychotic medication will assist Diaz in his cooperation with his attorney.

On cross-examination, Dr. Pietz testified that she last saw Diaz approximately a month prior to testifying. When Diaz returned to Springfield medical center in May 2009, Diaz did converse with her "at some length." However, toward the end of her more recent period of evaluation, Diaz typically would not speak to Dr. Pietz or would engage in only limited conversation and "dismiss" her. Despite the fact that Diaz is being held apart from the general prison population, Dr. Pietz does not believe that he is a danger to himself or to others, or that there are any other grounds on which to justify forced medication.[5] In Dr. Pietz's experience, it is "very rare" that, upon taking anti-psychotic medication, a patient's condition does not improve such that he becomes competent. Dr. Pietz does not believe that individual or group therapy is appropriate for Diaz because such therapy becomes useful only after a patient begins taking medication that corrects the chemical imbalance that causes

_____

[5]During re-direct, Dr. Pietz stated that Diaz had been held in a "locked unit," away from the general prison population, since January 2009, when he received an "incident report" for being in a forbidden area without permission and startling a staff member. Later, Diaz was involved in a fight with another inmate in a secured recreational area. Despite these incidents, Dr. Pietz did not believe that Diaz was a danger to himself or to others.

11

psychosis, which is a "biological condition."  Dr. Pietz does not believe that Diaz is malingering.

On re-direct, Dr. Pietz testified that, if Diaz is ordered to be forcibly medicated, she and Dr. Sarrazin will be his clinical team, and Dr. Sarrazin will write the prescription for the medication.  In response to the court's questions, Dr. Pietz stated that to her knowledge, Diaz has never been medicated and she expects that he will likely not respond quickly to medication.  Dr. Pietz stated that if Diaz is not restored to competency within four months, she will request an extension from the court to continue administering medication for another four months, and again at the end of eight months if Diaz is improving but is not yet restored to competency.  If all avenues are exhausted and Diaz is not restored to competency, Dr. Pietz will return him to the court as incompetent.

## 2. Dr. Robert Sarrazin

The government next called Dr. Robert Sarrazin, Chief of Psychiatry at Springfield medical center.  Dr. Sarrazin has had hundreds of cases involving involuntary medication.  Of these cases, a small number involved the specific question of involuntary medication to restore a patient to competency to stand trial. In this group of cases, between 75% and 80% of patients forcibly medicated attained competency to stand trial.  Dr. Sarrazin assisted Dr. Pietz in treating Diaz

12

by acting as the consulting psychiatrist in Diaz's case. Dr. Sarrazin personally evaluated Diaz between May 21 and June 12, 2009, primarily by observing his behavior. Dr. Sarrazin reviewed all of Diaz's previous records and his current chart and consulted with Dr. Pietz. Dr. Sarrazin met with Diaz on June 3, 2009 after the due process hearing conducted by Dr. Tomelleri. Based on his observations of Diaz, his consultation with Dr. Pietz, and his review of the reports, Dr. Sarrazin concluded that Diaz suffers from chronic paranoid schizophrenia. Dr. Sarrazin noted that Diaz was "not very cooperative" during the evaluation process and would refuse to speak with others or leave his cell for an evaluation. While at Springfield medical center, Diaz has refused to take medication.

Dr. Sarrazin reviewed several studies addressing the use of medication to restore psychotic patients to competency. He summarized the results of these studies as follows: (1) a general 1992 study of 150 incompetent defendants in a state forensic hospital found that only 8 of these patients could not be restored to competency, yielding an approximate 95% success rate; (2) a 1993 study of 45 incompetent pre-trial defendants, suffering from psychotic disorders, found that 87% of these patients were restored to competency with involuntary psychotropic medication; (3) a 2007 study reviewing Ohio state psychiatric hospitalizations from 1995 to 1999 found that 75% of patients were restored to competency with

13

involuntary medication; and (4) another 2007 study of 22 individuals diagnosed with delusional disorder (a psychotic disorder different from schizophrenia) found that 77% of the patients were restored to competency by the use of involuntary anti-psychotic medication. Based on this data, as well as his own experience with involuntary medication of patients, Dr. Sarrazin opined that it is "substantially likely" that Diaz will be restored to competency if given anti-psychotic medication.

Dr. Sarrazin further testified that the American Psychiatric Association ("APA") has promulgated practice guidelines and data addressing the treatment of schizophrenic patients. The APA data reported that 83% of "first episode" patients experience "stable remission," by the end of one year of treatment, meaning their symptoms (such as hallucinations and confusion) decrease to the point that the individual can return to his or her normal activities. The end point of the APA data, Dr. Sarrazin stated, was that individuals get to this type of remission, rather than "competency." The APA data showed, however, that between 10% and 30% of schizophrenic patients have little to no response to anti-psychotic medication, and that up to another 30% have only a "partial" response to medication, "meaning they exhibit improvement in psychopathology but continue to have mild to severe residual hallucinations or delusions." The APA data did not address success rates in situations where competency, rather than remission, was the end point.

14

Dr. Sarrazin also noted that, because Diaz has never taken anti-psychotic medication, there is no record of whether he previously had responded or not responded to medication. Dr. Sarrazin testified that, under the most optimistic view of the APA data, there is a 90% chance that anti-psychotic medication will restore Diaz to competency. Under the most pessimistic view of the APA data, there is a 30% chance that Diaz will not respond to medication at all, a 30% chance that Diaz will partially respond to the medication but will not attain competency, and a 40% chance that Diaz will respond to the medication and attain competency. Dr. Sarrazin explained that anti-psychotic medications improve cognitive thinking and lessen hallucinations in individuals who suffer from schizophrenia.

As to side effects, Dr. Sarrazin testified that, although anti-psychotic medications can cause sedation, this side effect is usually a short-term condition and can be improved by shifting the timing of the medication or splitting the dosage. Dr. Sarrazin clarified that anti-psychotic medication likely will improve Diaz's cognition, and is unlikely to cause a decrease in Diaz's cognitive ability.

According to Dr. Sarrazin, anti-psychotic medications can be classified as first-generation, or typical, medications, or as second-generation, or atypical, medications. Second-generation and first-generation medications are equally effective. However, second-generation medications are less likely to cause

15

neuromuscular side effects than first-generation medications.

The neuromuscular side effects at issue include stiffness, shakiness, and akathisia, which is "an internal feeling of restlessness." These side effects can be controlled by administering supplemental medications, such as Benadryl or Cogentin. Neuromuscular side effects are associated with injections of a medication called Haldol (known generically as haloperidol decanoate, or simply haloperidol) and, as a result, Springfield medical center staff usually adds supplemental medication to Haldol to control these side effects. If the medical center staff administered an anti-psychotic medication to Diaz, they would closely monitor him for neuromuscular side effects, and if he displayed any acute neuromuscular side effects, a treatment plan was already laid out. If supplemental medications such as Benadryl or Artane are used with Haldol, Diaz would be monitored to ensure that those medications do not cause confusion as a side effect.

Dr. Sarrazin further testified that patients who take a first-generation medication over a term of years may experience "tardive dyskinesia" and "tardive dystonia," conditions where the patient experiences abnormal movements of the mouth and tongue and, sometimes, other parts of the body. Patients taking second-generation anti-psychotic medications experience these side effects at a rate of 2%, or 5% in a population of elderly patients. Individuals on long-term treatment with

16

first-generation anti-psychotic medications experience tardive dystonia at a rate of 1%-2%.

Dr. Sarrazin also discussed "metabolic" side effects. Second-generation anti-psychotic medications can cause elevated blood-sugar levels or diabetes. Springfield medical center monitors patients' blood-sugar levels and weight on a monthly basis, and monitors patients' lipid, cholesterol, and hemoglobin[6] levels once every three months. If a patient experiences an increase in his blood-sugar level, the medical staff responds by altering the patient's diet or changing his anti-psychotic medication. The medical center would likely administer to Diaz medications called Geodon or Abilify, because these medications have a lower association with heightened blood-sugar levels.

Dr. Sarrazin further testified that, on rare occasions, anti-psychotic medications can cause serious or even fatal side effects. On "exceedingly rare" occasions, and even more rare in second-generation anti-psychotics, a patient can suffer from neuroleptic malignance syndrome, which causes a patient to become rigid, have an elevated body temperature, and, without treatment, experience muscle deterioration and kidney damage. If not treated promptly, this condition poses a 10% to 20% mortality rate. Dr. Sarrazin explained that the medical center

---

[6]The "hemoglobin A1C" test is used to measure the patient's blood glucose levels over the course of the three months before the test.

17

monitors patients for symptoms of this condition. In addition, some first-generation medications, including Mellaril, can cause a patient to have an irregular heartbeat that, in turn, can cause sudden death. The medical center avoids prescribing these medications, and closely monitors patients who take these medications.

Dr. Sarrazin also mentioned that some anti-psychotic medications have side effects, such as light-headedness, constipation, and trouble with urination. These side effects can be managed by lowering the dosage and selecting medications that have a lower risk of these side effects. Dr. Sarrazin has been successful in reducing or eliminating side effects.

Dr. Sarrazin then discussed data regarding the efficacy of psychotherapy for treating individuals with schizophrenia. Dr. Sarrazin opined that individual psychotherapy without medication is not an effective treatment option for Diaz, and that the preferred treatment for schizophrenia is anti-psychotic medication. Once a patient begins taking medication, however, psychotherapy is useful primarily to encourage the patient to continue to take his medicine, and it may be helpful for Diaz once he begins taking medication.

Dr. Sarrazin reiterated that anti-psychotic medication is medically appropriate for the treatment of schizophrenia as it is the "treatment of choice" and

18

the "gold standard" for treating patients with the disease. Dr. Sarrazin opined that the administration of anti-psychotic medicine to Diaz will likely render him competent to stand trial and will be unlikely to cause side effects that would interfere significantly with Diaz's ability to assist counsel in conducting his defense. Because Diaz is not currently on any medications, Dr. Sarrazin is not concerned about any drug interactions.

Dr. Sarrazin and Dr. Pietz created a treatment plan for Diaz. Dr. Sarrazin would administer to Diaz, on a daily basis, one of these medications: (1) 15 to 60 mg of Abilify, (2) 80 to 320 mg of Geodon, (3) 2 to 12 mg of Risperdal, or (4) 2 to 40 mg of Haldol. Each medication is a second-generation medication, with the exception of Haldol, a first-generation medication. Dr. Sarrazin would first attempt to administer orally a second-generation medication to Diaz, starting with low doses and increasing the dosage slowly to lessen side effects while monitoring Diaz closely. They would administer Haldol only if Diaz were to refuse to take medication voluntarily by swallowing a pill, thus making it necessary to use an injectable medication.

Dr. Sarrazin testified that, in commencing Diaz's treatment, medical center staff plan to show Diaz a copy of the court's order for involuntary medication and ask him to comply with the order. If Diaz refuses to comply, the staff forcibly will

19

inject Diaz with his medication. Dr. Sarrazin will prescribe the lowest dosage possible in order to treat Diaz effectively. If Diaz becomes agitated or combative when receiving medication, the staff will inject him with a dose of 2 milligrams of Lorazepam, which will calm him down so that he can be safely released from restraints.

Dr. Sarrazin verified that the government requested a four-month period in which to restore Diaz to competency. Because Diaz is going to be involuntarily medicated, the period of time may need to be six or eight months before Diaz can be effectively restored to competency. Diaz will continue to receive involuntary treatment to maintain his competency until the conclusion of all pretrial and trial proceedings. Dr. Sarrazin believes that anti-psychotic medication has a substantial probability of rendering Diaz competent to stand trial. If Diaz indicates that he will cooperate with oral medication, the staff will switch from injecting his medication to oral medication.

On cross-examination, Dr. Sarrazin conceded that, because Dr. Pietz has other patients for whom she is the primary clinician, she has been unable to spend all of her working hours focused on establishing a relationship with Diaz and convincing him to take his medication. Dr. Sarrazin does not believe that Diaz is malingering. If Diaz is malingering, the medication will have no effect on his

fabrication of symptoms. Dr. Sarrazin does not believe that physically forcing a patient to take medication will have long-lasting psychological effects on the patient. On re-direct examination, Dr. Sarrazin reiterated that treatment with anti-psychotic medications is medically appropriate for Diaz, and that Diaz will not regain competency without medication.

**E.     Government Exhibits at Sell Hearing**

At the Sell hearing, the government's exhibits included (1) Dr. Sarrazin's written psychiatric report, dated June 12, 2009, (2) a second forensic psychological report by Dr. Pietz, dated June 18, 2009,[7] and (3) Springfield medical center's involuntary-medication report based on the due process hearing held on June 3, 2009 and conducted by Dr. Tomelleri.

Dr. Sarrazin's written report noted that Diaz initially was admitted into Springfield medical center on December 30, 2008. Diaz subsequently left the center in order to participate in a court hearing and returned to the center on May 21, 2009 following the district court's finding that he was not competent to proceed with his legal case. Dr. Sarrazin evaluated Diaz between May 21 and June 12, 2009. Dr. Sarrazin's report states that (1) Diaz did not cooperate during

---

[7]Dr. Pietz's first forensic psychological report dated February 3, 2009, which was admitted as evidence during the second competency hearing on May 6, 2009, was not admitted as evidence at the Sell hearing on September 8, 2009.

interviews and refused to answer questions; (2) in an interview with Dr. Sarrazin on June 3, 2009, Diaz refused to provide details about his past psychiatric history and previous treatment; and (3) Diaz "appears to be disorganized in his presentation, uncooperative, clearly delusional, and describes his system of bizarre delusional beliefs."

Dr. Sarrazin's report summarized the empirical data supporting his opinion that anti-psychotic medication will restore Diaz to competency and the likelihood of side effects. Dr. Sarrazin's report also noted, as he had testified, that Diaz would be monitored for any acute neuromuscular side effects during the treatment. The report laid out a detailed plan of how to manage such side effects by treating Diaz with various supplemental medications. The report noted that neuromuscular side effects were more likely to occur in a first-generation anti-psychotic than in the second-generation medications. Haldol carries a much higher risk of both acute and delayed neuromuscular reactions but this can be treated with supplemental medication. Akathisia can occur in 20% to 30% of patients treated with first-generation medications, and in lower rates with second-generation medications, but can be treated by reducing the dosage or using supplemental medication.

The second most likely side effect was "drug induced parkinsonism," which

is characterized by muscle rigidity, resting tremor (muscle contractions, or twitching), and decreased spontaneous facial expressions. Between 15% and 50% of patients taking a first-generation medication and, in lower rates, patients taking a second-generation medication, experience drug-induced parkinsonism. These symptoms are "easily treated" by reducing a patient's dosage, or by using a supplemental medication. Acute dystonic reactions, defined as sustained contraction of various muscle groups, occur in 2% to 10% of patients treated with first-generation medications, and in lower rates with second-generation medications. These reactions are "easily, effectively and quickly" treated with supplemental medication.

Dr. Sarrazin's report noted that, based on the statistical data, Diaz would be unlikely to experience the delayed neuromuscular side effects of tardive dyskinesia or tardive dystonia if treated for a year with either a first- or second-generation medication,[8] but noted that he will be monitored on a monthly basis for any delayed onset movement disorders.

Dr. Sarrazin's report noted that metabolic side effects could be prevented largely by avoiding second-generation medications highly associated with such

---

[8]The rate of tardive dyskinesia with first-generation treatments is 5% yearly in a general population and 25%-30% in an elderly population. With second-generation treatments, it is only 2% yearly in the general population and 5% in an elderly population. Tardive dystonia occurs in 1%-2% of individuals receiving long term treatment with first-generation medications.

side effects and by monitoring Diaz. Anticholinergic side effects such as confusion, urinary retention, and constipation are most likely to occur in a geriatric population and are best managed by prescribing medication with low risk of causing such side effects. As for more rare but dangerous side effects, such as neuroleptic malignant syndrome and sudden death, the report noted that rates are extremely low. As to other risks posed by drug interactions or medical ailments, Dr. Sarrazin's report noted that Diaz has no current medical diagnoses and is not on any current medications that would result in potential drug interactions. Diaz has no major medical diagnosis, and his laboratory studies have been unremarkable.

Based on his review of statistical data and examination of Diaz, Dr. Sarrazin believed that Diaz's response would be similar to the empirical study showing 87% of patients restored to competency, as well as two studies, one showing a 75% "treatment response rate" and the other showing an 87% "treatment response rate." Based on this empirical data, Dr. Sarrazin opined that involuntary treatment of Diaz with anti-psychotic medication will be substantially likely to render Diaz competent to stand trial and substantially unlikely to have side effects that will interfere significantly with Diaz's ability to assist counsel in conducting a defense. Diaz exhibited a relatively high level of social functioning, which indicates that

Diaz will react positively to medication.

Dr. Sarrazin's report also laid out, in detail, the proposed treatment plan about which Dr. Sarrazin testified. Diaz will first be presented with a copy of the court order authorizing involuntary treatment, and "[t]he treating psychiatrist [will] attempt to enlist Mr. Diaz's cooperation by engaging in a discussion of the available options of taking oral anti-psychotic medications on a daily basis at the lowest effective dose" and will explain the required procedures to take the medication voluntarily. As long as Diaz is willing to cooperate, the treating psychiatrist would prescribe one or more "trials" with one of several oral medications,[9] the "goal" being "to achieve clinical improvement at the lowest effective dose starting at the low end of the dosing range and gradually increasing the dose as clinically indicated." The regimen will be switched to another medication if Diaz develops intolerable side effects.

If Diaz refuses to take oral medication after receiving a copy of the court order and after being given an opportunity to discuss the issues with the treating

---

[9]Dr. Sarrazin's report listed the following recommended oral medications and doses: (1) aripriprazole (Abilify) at target doses of 15 mg to 60 mg daily; (2) ziprasidone (Geodon) at target doses of 80 mg to 320 mg daily; (3) risperidone (Risperdal) at target doses of 2 mg to 12 mg daily; and (4) haloperidol (Haldol) at target doses of 2 mg to 40 mg daily. The report specified that aripriprazole or ziprasidone would be recommended as the initial treatment due to their more favorable side effect profile, and that olanzapine would not be recommended unless trials with aripriprazole were not effective or well tolerated due to its somewhat higher risk of metabolic side effects.

25

psychiatrist, treatment will be initiated with long-acting anti-psychotic medication administered by injection. Diaz will first receive a "test dose" of 5 mg of haloperidol to identify any reactions to the drug, and the next day he will receive an injection of haloperidol decanoate, to be repeated two weeks later. Dr. Sarrazin's report listed several adjunctive medications and accompanying dosage ranges to treat any neuromuscular side effects that arise.[10] If such adjunctive treatments are ineffective against such side effects, Diaz will be offered an alternative anti-psychotic medication. Finally, if Diaz becomes agitated or combative during the administration of medication, he may receive an injection of 2 mg of lorazepam to calm him down.

Dr. Sarrazin's report noted that Diaz will be monitored for diabetes or elevated serum lipids through monthly weighings and measurements of his glucose and serum lipids. If Diaz refuses to cooperate with the monitoring protocols, the staff will attempt to educate him as to the rationale for the tests, and if he further refuses to cooperate, the protocol will be enforced involuntarily.

Dr. Pietz's second written forensic report, dated June 18, 2009, noted that,

---

[10]Recommended adjunctive medication included: (1) for muscle stiffness or tremor, bonztropine, at a dosage range of 0.5 mg to 1 mg, two to three times daily; (2) for restlessness, propranolol at a dosage range of 10 mg to 40 mg, two to three times daily; and (3) for neuromuscular side effects that do not respond to other treatments, lorazepam at a dosage range of 0.5 mg to 1 mg, two to three times daily.

since Diaz was admitted to Springfield medical center on May 21, 2009, she had attempted to interview Diaz on two occasions. On each occasion, Diaz "dismissed" her and refused to provide her with information about his background. Diaz refused to cooperate with any assessment procedures. Diaz informed Dr. Pietz that the judicial proceedings against him, as well as the psychological evaluation, were "illegal" and denied that he suffered from a mental illness. Although Dr. Pietz explained the need for Diaz to take medication for his illness, he refused to take medication voluntarily.

Dr. Pietz's report summarized past evaluations, including: (1) the evaluation by Dr. Michael Hilton on February 23, 2005, in which Dr. Hilton concluded that Diaz was incompetent to stand trial because he suffered from "undifferentiated schizophrenia" and "presented as floridly psychotic"; (2) forensic evaluations by Dr. Jorge Luis from April 4 to May 4, 2005, and from November 14, 2005 to January 3, 2006, in which Dr. Luis opined that Diaz was malingering and was competent to stand trial; (3) BOP records from seven different BOP facilities, reflecting that after May 2005, Diaz was consistently described as exhibiting psychotic symptoms; and (4) the telepsychiatric consultation by Dr. Wolfson on July 24, 2008, after which Dr. Wolfson opined that Diaz appeared psychotic and would likely benefit from taking anti-psychotic medication.

27

In her report, Dr. Pietz noted that the BOP records that she reviewed included "numerous entries made by psychology staff providing services to Mr. Diaz." After May 2005, these clinicians, with the exception of staff at FDC Miami, "consistently described" Diaz "as exhibiting psychotic symptoms. . . . [H]is thought processes were often described as bizarre and disorganized. Some clinicians described him as 'delusional and paranoid at times.'" Dr. Pietz's report included the quote of one author who noted that Diaz "'evidenced significant psychotic delusions that appeared to be rigidly adhered to, as evidenced by his stress response whenever this author or Dr. Gonzalez questionned [sic] him regarding the veracity or accuracy of his beliefs . . . .'"

In her report, Dr. Pietz also stated that she consulted with Dr. Wolfson about his telepsychiatric assessment of Diaz, and Dr. Wolfson noted that Diaz "spoke in neologisms, was vague, paranoid, and [his] speech was disorganized and difficult to follow." "Dr. Wolfson reiterated that Mr. Diaz appeared psychotic and substantially impaired during the consultation on July 24, 2008."

Dr. Pietz's report opined that treatment of Diaz with anti-psychotic medication was medically appropriate, necessary, and substantially likely to restore him to competency without side effects that would undermine the fairness of the trial.

The government's exhibits from the <u>Sell</u> hearing also include Springfield's report of the Due Process Involuntary Medication Hearing, which documented that Dr. Tomelleri conducted the hearing on June 3, 2009 to determine whether the medical center forcibly could medicate Diaz on the ground that he is dangerous or suffers from a grave disability. The report reflects that Diaz received written notice of the hearing on May 27, 2009.

## F.     Diaz's Evidence at the <u>Sell</u> Hearing

After Dr. Sarrazin's testimony, Diaz's attorney informed the court that Diaz wished to comment on the testimony thus far. At that point, Diaz made a variety of comments, including that the administration of medication at the medical center was a "war crime," that Dr. Pietz had lied about why Diaz was in a locked unit, and that Diaz was being unlawfully detained. Diaz contested the court's jurisdiction over him, complained about his attorney's assistance, and claimed he had additional witnesses who could speak on his behalf.

After Diaz's comments, Diaz's attorney introduced five documents that Diaz wished to be part of the record: (1) a document handwritten by Diaz entitled "Injunctive Suit Motion: Dialog in Truth," (2) a form "Appeal of Involuntary Medical Decision" issued by the medical center, attached to several handwritten pages, (3) a handwritten document entitled "Statement as a[n] International

29

Sovereign Diplomate [sic]," attached to a BOP form entitled "Request for Administrative Remedy," (4) a handwritten letter to the "Atlanta Consulate / Consulate General," dated May 7, 2009, and (5) an "Administrative Remedy System Informal Resolution Form" issued by the medical center, attached to a handwritten document. Diaz presented no further evidence.[11]

## G. District Court's Order

On October 13, 2009, the district court granted the government's request to medicate Diaz involuntarily. In its written order, the district court found that the government bears the burden of proof, by clear and convincing evidence, on all factual questions underlying the Sell factors. The district court first found that there are no alternative grounds that justify involuntary medication other than the government's interest in restoring the defendant to competency to stand trial. The district court noted that Dr. Tomelleri had conducted an administrative due process hearing under Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028 (1990), and found that Diaz does not present a danger to himself or others.

Next, the district court turned to the four Sell factors. As to the first factor, the court found that the government has an important governmental interest in

---

[11]The parties did not make closing arguments or statements. After the hearing, the parties did not file legal memoranda asserting arguments as to whether Diaz should be involuntarily medicated.

prosecuting Diaz, because his crimes are serious, and there are no significant special circumstances—such as a lengthy pre-trial confinement or the possibility of civil confinement—that lessen the importance of the government's interest.

Second, the district court found that involuntary medication would significantly further the government's interest because it is: (1) substantially likely to render Diaz competent to stand trial and (2) substantially unlikely to have side effects that would interfere with Diaz's ability to assist counsel in his defense. The district court found that Dr. Sarrazin: (1) estimated that Diaz has between a 75% and 87% chance of attaining competency if given medication involuntarily and (2) explained that, although the APA data reflects a lower success rate, this is attributable to the fact that this data is based on a different standard of success than restoring individuals to competency. The district court noted that both Dr. Sarrazin and Dr. Pietz (1) testified that medication likely will cause Diaz to attain competency and (2) agreed that anti-psychotic medications improve a patient's cognitive ability.

The district court also found that the more common side effects of anti-psychotic medication are relatively minor. Although the medication can cause more serious side effects, these occurrences are uncommon and easily could be treated with supplemental medication. The court emphasized that Diaz will be

31

closely monitored by medical staff for serious side effects.

Third, the district court found that involuntary medication is necessary to further governmental interests because (1) other less-intrusive treatments are unlikely to achieve substantially the same results, and (2) psychotherapy alone would not be effective in treating Diaz and is generally not effective in treating schizophrenia. The court also found that Diaz (1) refused to take medication, (2) consistently resisted medical staff's attempts to conduct evaluations, and (3) denied that he suffers from a mental illness. The court found that it is unlikely that Diaz would comply with a court order directing him to take medication, as Diaz did not recognize the court's authority. Finally, the district court determined that the administration of anti-psychotic medication is medically appropriate. In this regard, the court noted that both Dr. Pietz and Dr. Sarrazin testified that this treatment is medically appropriate, and that Dr. Pietz stated that Diaz's condition will not improve unless he takes anti-psychotic medication.

Given its assessment of the Sell factors, the district court directed Springfield medical center to medicate Diaz forcibly in accordance with Dr. Sarrazin's treatment plan and the district court's opinion, but only after "first seeking to obtain Mr. Diaz's voluntary participation with any treatment."

Diaz filed a motion to stay the execution of the involuntary-medication order

pending appeal, which the district court granted.[12]  Diaz now appeals.   Diaz

contends that the government failed to meet its burden as to the second and third

Sell factors.

## II.  STANDARD OF REVIEW

We generally review a district court's factual findings for clear error and its

legal conclusions de novo.  Thomas v. Bryant, 614 F.3d 1288, 1307 (11th Cir.

2010).  We also review a district court's application of the law to the facts de novo.

United States v. Frank, 599 F.3d 1221, 1228 (11th Cir.), cert. denied, 131 S. Ct.

186 (2010).  Neither the Supreme Court nor this Court, however, has addressed

specifically the standard of review of a district court's rulings as to the four Sell

factors.  The majority of circuits that have considered the issue concluded that the

first Sell factor (whether important governmental interests are at stake) is a legal

question subject to de novo review, while the last three Sell factors present factual

questions subject to clear error review.  See United States v. Fazio, 599 F.3d 835,

839-40 (8th Cir. 2010) (holding that first Sell factor is reviewed de novo, while

---

[12]The district court's involuntary-medication order is not a final order that ends the litigation of this criminal case on the merits.  See 28 U.S.C. §§ 1291, 1292; Atl. Fed. Sav. & Loan Ass'n of Ft. Lauderdale v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 375-76 & n.7 (11th Cir. 1989) (holding that we generally lack jurisdiction over an appeal from an interlocutory order).  Nevertheless, we have jurisdiction over the present appeal under the collateral-order doctrine, as it (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment.  Sell, 539 U.S. at 176-77, 123 S. Ct. at 2182.

33

remaining factors are reviewed for clear error), cert. denied, __ S. Ct. __, 2011WL 55488 (U.S. Jan. 6, 2011) (No. 10-5998); United States v. Green, 532 F.3d 538, 546, 552 (6th Cir. 2008) (holding that first Sell factor is reviewed de novo, while second and fourth factors are reviewed for clear error), cert. denied, 129 S. Ct. 2735 (2009); United States v. Hernandez-Vasquez, 513 F.3d 908, 915-16 (9th Cir. 2008) (holding that first Sell factor is reviewed de novo, while remaining factors are reviewed for clear error); United States v. Palmer, 507 F.3d 300, 303 (5th Cir. 2007) (same); United States v. Evans, 404 F.3d 227, 240 (4th Cir. 2005) (reviewing district court's conclusions as to the second and fourth Sell factors for clear error); United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004) (holding that first Sell factor is reviewed de novo, while the remaining factors are reviewed for clear error).  But see United States v. Bradley, 417 F.3d 1107, 1113-14 (10th Cir. 2005) (holding that Sell factors one and two are legal questions reviewed de novo, while factors three and four are factual findings reviewed for clear error). The parties here agree with these circuits.

After review, we agree with our sister circuits and hold that our review of the first Sell factor is de novo, and our review of the remaining three Sell factors is for clear error.

## III.  DISCUSSION

34

## A.     Four <u>Sell</u> Factors

In <u>Sell</u>, the Supreme Court indicated that "an individual has a constitutionally protected liberty interest in avoiding involuntary administration of anti-psychotic drugs—an interest that only an essential or overriding state interest might overcome."  539 U.S. at 178-79, 123 S. Ct. at 2183 (quotation marks omitted).  The Supreme Court instructed that, before considering whether a defendant may be involuntarily medicated to attain competency to stand trial, a district court should consider whether a defendant may be involuntarily medicated for an alternative reason—such as the danger that he poses to himself or others, or the fact that his refusal to take medication places his health at grave risk.  <u>Id.</u> at 181-82, 123 S. Ct. at 2185.

However, if the defendant cannot be medicated for an alternative purpose, a court may order under <u>Sell</u> that he be involuntarily medicated to attain competency to stand trial, as long as a court finds these criteria satisfied: (1) the government has an "important" interest in going to trial; (2) involuntary medication would "significantly further" the governmental interest; (3) involuntary medication is necessary to further the governmental interest; and (4) involuntary medication is medically appropriate, "<u>i.e.,</u> in the patient's best medical interest in light of his medical condition."  <u>Id.</u> at 179-83, 123 S. Ct. at 2184-86.  Given these

requirements, the Supreme Court noted that such instances "may be rare." Id. at 180, 123 S. Ct. at 2184.

On appeal, Diaz argues that the government failed to carry its burden of proof on the second and third Sell factors. We therefore address the burden of proof.

**B.      Burden of Proof**

Neither the Supreme Court nor this Court has addressed the burden of proof in involuntary medication cases under Sell. See generally Sell, 539 U.S. at 169-86, 123 S. Ct. at 2178-87. Other circuit courts that have considered this issue uniformly concluded that in Sell cases the government bears the burden of proof on factual questions by clear and convincing evidence. See, e.g., Fazio, 599 F.3d at 840 n.2 ("We agree with our sister circuits that the government bears the burden of proving the final three Sell factors by clear and convincing evidence."); United States v. Bush, 585 F.3d 806, 814 (4th Cir. 2009) ("[W]e conclude that the government had the burden of satisfying the Sell standard by clear and convincing evidence . . . ."); United States v. Grape, 549 F.3d 591, 598-99, 604 (3d Cir. 2008) ("[A]ll courts of appeals addressing this issue have held that the Government bears the burden of proof on factual questions by clear and convincing evidence."); Green, 532 F.3d at 545 (holding government bears burden of proof on all Sell

factors by clear and convincing evidence); United States v. Valenzuela-Puentes, 479 F.3d 1220, 1224 (10th Cir. 2007) ("[T]he district court must find all necessary facts [in a Sell hearing] by 'clear and convincing evidence.'") (quoting Bradley, 417 F.3d at 1114); Gomes, 387 F.3d at 160 ("[T]he relevant findings [underlying the Sell factors] must be supported by clear and convincing evidence.").

Here, the government does not disagree that its burden is to prove the factual questions underlying the Sell factors by clear and convincing evidence. We agree with our sister circuits and hold that the government bears the burden of proving the factual findings underlying the Sell factors by clear and convincing evidence.

## C. Second Sell Factor

The second Sell factor is whether involuntary medication will significantly further the government's interest. As to this second factor, district courts must consider and determine two underlying factual questions: (1) whether medication is "substantially likely to render the defendant competent to stand trial," and (2) whether the medication is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181, 123 S. Ct. at 2184-85.

Contrary to Diaz's claims about the second Sell factor, the district court did

not clearly err because the evidence strongly demonstrates a substantial likelihood that anti-psychotic medication will restore Diaz to competency and is not substantially likely to cause side effects that would interfere with Diaz's ability to assist counsel. Both Dr. Pietz and Dr. Sarrazin provided expert opinions concluding that, based on the data available to them, as well as their personal experiences in treating patients similar to Diaz, there is a substantial likelihood that anti-psychotic medication would restore Diaz to competency. Their conclusions largely were supported by statistical studies, which showed that between 75% and 87% of patients who were declared incompetent due to psychosis were restored to competency with the use of anti-psychotic medication. See United States v. Nicklas, 623 F.3d 1175, 1180 (8th Cir. 2010) (affirming district court's conclusion that second Sell factor satisfied because "based on Dr. Newman's assessment of a 70% success rate, . . . medication is substantially likely to render [defendant] competent to stand trial") (quotation marks omitted); Green, 532 F.3d at 552-53 (affirming district court's conclusion that second Sell factor satisfied where statistical data cited by government experts "found improvement in a range of approximately 76% to 93% of those treated," and lower statistics cited by defendant related to "wellness," not competency); Bradley, 417 F.3d at 1115 (affirming district court's conclusion that second Sell factor satisfied because

38

clinical psychologist testified that "more than 80% of defendants committed for competency restoration treatment [at Springfield medical center] are later deemed competent by the trier of fact"); Gomes, 387 F.3d at 161-62 (affirming district court's conclusion that second Sell factor satisfied where BOP had 70% success rate restoring competence with anti-psychotic medication, and doctors at the medical center testified there was a substantial likelihood of restoring the defendant to competency); see also United States v. Ghane, 392 F.3d 317, 319-20 (8th Cir. 2004) (holding that district court clearly erred in finding second Sell factor satisfied based on evidence of a 5-10% success rate in treating patients with delusional disorder through medication).

Diaz argues that the district court erred because the lower success rates reported in the APA data and Dr. Sarrazin's testimony indicate that anti-psychotic medication has only between a 40% and 70% chance of restoring him to competency. However, Dr. Sarrazin testified that the APA data did not address the success of medication in restoring patients to competency but rather the endpoint of stable remission. Importantly, Dr. Sarrazin's report indicated that, although the APA data used a different standard of success than competency, the data reflected that 83% of "first episode" schizophrenic patients who took anti-psychotic medication experienced stable remission of their symptoms after a year. Dr. Pietz

39

also testified that, in her experience, between 60% and 70% of patients were restored to competency with involuntary medication, and those cases where a patient did not attain competency usually were caused by a patient's cognitive defect, such as mental retardation.

We recognize that Diaz also argues that his medical history does not show that he has a history of responding to anti-psychotic medication. However, the lack of prior documented history of Diaz's reaction to anti-psychotic medication does not change our conclusion. Diaz presented no evidence to contradict the above findings or to show that he is not likely to have the favorable response common in the statistical data. Cf. Gomes, 387 F.3d at 162 (in the context of the third Sell factor, the district court did not clearly err in concluding forced medication was necessary to further the government's interest merely due to defendant's lack of prior treatment while in custody, where defendant presented no evidence as to efficacy of alternative treatments). Moreover, although Diaz did not have a history of treatment with such medication, Dr. Sarrazin reported that Diaz's relatively high level of social interaction made it more likely that he would respond to anti-psychotic medication.

As for Diaz's argument that the government failed to show that medication is not substantially likely to cause side effects, the district court did not clearly err.

Under Sell, the pertinent side effects are those that could impede a defendant's ability to assist counsel. See Sell, 539 U.S. at 185-86, 123 S. Ct. at 2187. Diaz focuses on the potential for first-generation medications, such as Haldol, to cause neuromuscular side effects. However, Dr. Sarrazin testified that Springfield medical center will inject Diaz with Haldol only if he refuses to take a second-generation medication orally, and that the center will cease the injections entirely if Diaz agrees to take medication voluntarily. Moreover, Dr. Sarrazin testified that neuromuscular side effects easily can be controlled with supplemental medication, and that Springfield medical center staff will monitor Diaz for these side effects. The proposed treatment plan in Dr. Sarrazin's report outlines in detail the types and dosage ranges of adjunctive medication recommended to treat any potential side effects that arise.

In addition, the proposed plan provides that if Diaz experiences side effects that do not respond to these adjunctive medications, his treatment regimen will be switched to another medication listed in Dr. Sarrazin's report. The two life-threatening conditions that can be caused by first-generation medications are extremely rare, and Dr. Sarrazin testified that Springfield medical center staff would monitor Diaz for symptoms of these conditions, as well as for diabetes and other metabolic side effects. While Diaz argues that the district court

41

underestimated the impact that neuromuscular side effects can have on a defendant, he does not explain how such side effects could interfere with his communications with counsel or why he is especially likely to suffer from side effects that might interfere in such a way. Nor does Diaz explain how the treatment plan in Dr. Sarrazin's report has failed to provide for the monitoring, prevention, and treatment of such side effects.[13]

Diaz argues that because Haldol is a first-generation anti-psychotic medication, it is in the same class of drugs as Mellaril, which he argues is "notorious for potentially causing severe side effects that can both prevent an individual from adequately participating in his defense and may cause irreversible and serious damage to one's health." However, Dr. Sarrazin focused on the side effects caused by Haldol, not Mellaril, because Mellaril is not on the list of recommended medications in the proposed treatment plan for Diaz. Diaz has offered no evidence that Mellaril and Haldol carry the same risk of side effects. Furthermore, Dr. Sarrazin testified that Springfield medical center avoids prescribing medications like Mellaril which can cause an irregular heartbeat, and

---

[13] In his brief, Diaz has citations to medical journal articles that he did not submit as evidence to the district court. This evidence is not part of the record on appeal, and we decline to consider it. See Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 871 n.15 (11th Cir. 1986) (holding that we would not consider the appellant's argument that the district court erred by failing to consider certain data, because this data was not part of the record on appeal); see also United States v. Bonds, 12 F.3d 540, 552 (6th Cir. 1993) (holding that the court would not "consider a report that is not part of the record").

42

closely monitors patients who take such medications. Dr. Sarrazin did not mention

Haldol as a drug that, like Mellaril, could cause such symptoms.

In addition, while Diaz asserts that the government cannot meet its burden

merely by showing that anti-psychotic medication is safe for the general public,

this argument lacks merit because the government's evidence relates to Diaz

personally. Dr. Sarrazin testified about, and his report discussed, potential side

effects and risks from medication based on Diaz's specific health situation, and his

report proposed a detailed treatment plan that would avoid and counteract side

effects with low dosages, monitoring, and supplemental medication. Dr. Sarrazin's

report noted that Diaz did not have another major medical diagnosis or ailment that

would pose an additional risk. Cf. Evans, 404 F.3d at 240-42 (concluding that

district court erred in finding second and fourth Sell factors satisfied where

treatment plan gave no specific dosage ranges and medications to restore

defendant's competency and did not relate the proposed treatment plan to the

defendant's particular medical condition where defendant was elderly, had

diabetes, asthma, and hypertension, and was already taking a number of

medications).

## D.  Third Sell Factor

The third Sell factor is whether involuntary medication is necessary to

further the government's interests. As to the third factor, a district court must (1) find any "alternative, less intrusive treatments are unlikely to achieve substantially the same results," and (2) "consider less intrusive means for administering the drugs," such as a court order backed by the power of contempt, before considering more intrusive methods. Sell, 539 U.S. at 181, 123 S. Ct. at 2185.

Diaz contends that the government should have pursued the less-intrusive alternative of convincing him to take his medication voluntarily by making a serious effort to develop a stable relationship between Diaz and his therapist, but instead the Springfield medical staff merely made "token" efforts to convince him to take medication voluntarily before commencing due process involuntary medication proceedings. Diaz, however, ignores the fact that he has refused medication and other forms of treatment numerous times over the year prior to his most recent stay at Springfield medical center. In July 2008, while at USP Lewisberg, Diaz refused to take medication despite Dr. Wolfson's recommendation that he do so and refused to participate in a program to improve his ability to function in society. During Diaz's initial stay at Springfield in early 2009, Dr. Pietz attempted to evaluate Diaz from December 31, 2008 through January 31, 2009, but he refused, despite numerous attempts by Dr. Pietz, to participate in any clinical interviews, to complete psychological testing, and to

44

answer questions about his background. In her report, Dr. Pietz noted that when Diaz initially arrived at Springfield on December 31, 2008, he refused to answer all questions from the psychologist on staff and informed a nurse that he did not believe in taking drugs.

Throughout his more recent stay at Springfield beginning in May 2009, Diaz continued to refuse to participate in interviews with Dr. Pietz and Dr. Sarrazin. Specifically, Dr. Pietz reported that she met with Diaz numerous times, and that he often refused to speak to her and was "dismissive." Dr. Tomelleri's report documented that Diaz did not wish to consider taking psychotropic medication and that, since he had been admitted to Springfield, he had refused psychological testing and refused to attend any required orientation proceedings.

Importantly, both Dr. Sarrazin and Dr. Pietz testified that psychotherapy, which includes one-on-one conversations between a patient and his therapist, is not effective to treat schizophrenia in the absence of medication because schizophrenia is caused by a "biological condition"—a chemical imbalance that causes psychosis. In his report, Dr. Tomelleri noted that treating Diaz with psychotherapy would be "futile." Diaz presented no evidence to contradict this testimony. The district court was entitled to conclude that additional conversations between Dr. Pietz and Diaz would not have induced Diaz to take medication voluntarily.

45

Finally, Dr. Sarrazin testified that, before the medical center staff injected Diaz with any medication, they first would show him a copy of the court's order and ask him to comply with it. If Diaz became cooperative during the course of treatment, the staff would switch from injecting his medication to allowing him to take a medication orally.

Given the ample evidence presented by the government that Diaz has, repeatedly and for a time period of over a year, refused to take medication, and that alternative treatments for Diaz would be ineffective, the district court did not clearly err in concluding that the government has shown by clear and convincing evidence that involuntary medication is necessary to render Diaz competent to stand trial. See Gomes, 387 F.3d at 162-63 (affirming district court's conclusion that less intrusive alternatives would be unlikely to render defendant competent where doctors testified that alternative forms of therapy would be ineffective and defendant had repeatedly refused treatment and indicated he would not cooperate under any circumstances).

**AFFIRMED.**